*1032 Opinion
LUI, J.—
Plaintiffs Michael Markow (Markow) and his wife, Francine Markow, sued Markow’s pain management physician, Howard L. Rosner, M.D., and Cedars-Sinai Medical Center (Cedars) for professional negligence and loss of consortium after Rosner’s treatment rendered Markow quadriplegic. A jury found that both Rosner and Cedars had been negligent, but that only Rosner’s negligence had been a substantial factor in causing Markow’s severe injuries. The jury nonetheless apportioned 40 percent of fault to Cedars, apparently on the basis of its finding that Rosner was Cedars’s ostensible agent. Both Rosner and Cedars appealed.
Cedars contends that, as a matter of law, Rosner could not be found to be its ostensible agent because in conditions of admissions forms (Conditions of Admissions forms) Markow initialed and signed on 25 separate occasions Cedars unambiguously informed Markow that all physicians furnishing services to patients were independent contractors, not agents or employees of Cedars. We agree and reverse the judgment as to Cedars. Under the circumstances, Markow knew or should have known that Rosner was not Cedars’s agent. Markow’s belief to the contrary was not objectively reasonable, and Cedars’s motion for judgment notwithstanding the verdict should have been granted.
Rosner contends that the evidence was insufficient to support the jury’s finding he was negligent, the special verdict was hopelessly inconsistent and warranted a new trial, the award of future economic damages was excessive, and plaintiffs were not entitled to costs under Code of Civil Procedure section 998.[1] We find no merit in Rosner’s claims and therefore affirm the judgment against him.
BACKGROUND
1. Markow’s decision to seek treatment from Rosner
Markow began to experience serious and chronic pain in 2003, following an automobile accident. By 2006, Markow suffered from “continuous” and “severe” pain in his neck, back, arm, and shoulder. To help Markow manage his pain, one of his doctors referred him to Rosner.
Markow researched Rosner on the Internet before going to see him. Markow visited Cedars’s Web page and was impressed to discover that Rosner was the medical director of the pain center at Cedars. The Web page *1033 stated that the center was the largest pain management program in the western United States, with 14 to 15 practitioners, “from psychologists through interventional pain physicians [and] two full-time committed procedure rooms.” The center treats approximately 27,000 patients per year and performs approximately 600 procedures per month. Although Cedars was 30 to 40 miles from his home, Markow elected to become one of Rosner’s patients. Markow testified he did so because Rosner was the medical director of a pain center at a major medical center that was also a teaching hospital. Markow explained that he went to Rosner because he “worked for the best hospital, one of the best hospitals in the country.”
Markow’s first appointment with Rosner was on May 15, 2006.
2. The actual and apparent relationship between Cedars and Rosner
Cedars’s pain center was located down the street from the actual hospital in a building owned by Cedars. Cedars owns or supplies the pain center’s equipment and consumables, and the nurses and other nonphysician staff members are employees of Cedars. In keeping with California’s ban on the corporate practice of medicine (Bus. & Prof. Code, § 2400), Rosner was not an employee of Cedars, but was instead a partner in the General Anesthesia Specialists Partnership Medical Group (GASP). GASP billed patients, including Markow, for Rosner’s professional services, and the evidence at trial demonstrated that Markow paid GASP for Rosner’s services.
Nonetheless, Rosner did not usually give patients his GASP business cards, but instead gave them business cards imprinted with Cedars’s name, without any reference to GASP. Cedars’s Web site identified Rosner as the medical director of its pain center, also without reference to GASP. The Web page for the pain center further directed potential patients to phone “1-800-CEDARS-1” to make an appointment. However, Rosner’s “Cedars” business card and his correspondence (to the extent reflected in the record) listed a different number in the 310 area code. In addition, with Cedars’s authorization, Rosner used a Cedars logo in his letterhead when corresponding with referring physicians. There were no signs in the pain center offices informing patients that Rosner worked for GASP.
3. Cedars’s disclosures regarding physicians’ status as independent contractors
Over the four-and-one-half-year period that Rosner treated Markow, Markow signed and initialed 25 Conditions of Admissions forms bearing Cedars’s name and logo. In May 2006, when Markow began his treatment with Rosner, the Conditions of Admissions form (Oct. 2003 rev.) was three *1034 pages long and single-spaced. The second paragraph on the first page of this form was printed in boldface and in a larger pitch than any of the other paragraphs. It stated as follows:
“2. Legal Relationship Between Hospital and Physicians
“In accordance with California law which prohibits the Corporate practice of Medicine, physicians are independent contractors and are neither employed by nor agents of this facility. Patient recognizes that Physicians furnishing services to the Patient, including without limitation Emergency Room physicians, radiologists, pathologists and anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes._(Initial here).”
In the smaller pitch used in the rest of the document and without boldface, the disclaimer continued and stated: “The physician groups include, but are not limited to: . . . General Anesthesia Specialists Partnership Medical Group.” The disclaimer paragraph was the only portion of the entire three-page document that a patient was asked to separately initial.
On July 15, 2006, the Conditions of Admissions form was amended. The third paragraph on the first page of the amended form was printed in a larger pitch than any of the other paragraphs. It stated as follows:
“3. PHYSICIANS ARE INDEPENDENT CONTRACTORS
“All physicians and surgeons furnishing services to the Patient, such as radiologists, pathologists, anesthesiologists and the like, are independent contractors and are not employees or agents of the Hospital. These physicians may bill separately for their services.”
Following this paragraph was either a boldfaced “Patient initials:_” or a large rectangle above the descriptor, “Patient initials: _.” Beneath the space for initialing, the disclaimer continued: “The patient is under the care and supervision of his / her attending physician and it is the responsibility of the Hospital and its nursing staff to carry out the instructions of such physician. It is the responsibility of the Patient’s physician or surgeon to obtain the Patient’s informed consent, when required, to medical or surgical treatment, special diagnostic or therapeutic procedures, or Hospital services rendered to the Patient under the general and special instructions of the physician.”
Markow testified that when he was first presented with a Conditions of Admissions in May 2006, he read it and, for some time thereafter, he *1035 continued to read each subsequent Conditions of Admissions before signing and initialing. Ultimately, however, he stopped reading them because “they all appeared to be the same.” Markow believed that the independent contractor disclaimer did not apply to Rosner because “he was director of pain management for the hospital” and, as a result, he “can’t be an independent contractor.” Markow thought Rosner must be a “full-time employee” of Cedars. Markow further testified that he believed, but was not certain, that his neurologist—who was also the director of a department at Cedars and also had an office in the same building as Rosner’s—was an employee of Cedars.
In addition to the 25 Conditions of Admissions documents, Markow signed at least eight documents entitled, “Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions,” prior to and on the date of the injurious procedure. Each of these contained the following paragraph on the first page: “3. I understand that the person or persons in attendance at such operation or procedures, as indicated above, for the purpose of administering anesthesia, and the person or persons performing other specialized professional services, such a radiology, pathology, and the like, are not the agents, servants or employees of Cedars-Sinai Medical Center, but are independent contractors performing specialized services on my behalf and, as such, are the agents of myself.”
4. Markow’s injuries during treatment
On November 11, 2010, Rosner performed a nerve root block procedure on Markow. This procedure was similar to other procedures that Rosner had performed on Markow, but was much higher on the spine, at the base of the skull near the brain stem. Rosner conceded at trial that the procedure was both “very rare” and quite “risky.”[2] Immediately after the procedure, Markow was in “tremendous pain, terrible pain,” as if “a thousand tiny hot lancets” were penetrating his face. It was a pain that Markow had never experienced before. Markow continued to experience this lancing pain in his face on an intermittent basis over the course of the next week.
On November 19, 2010, eight days after the procedure, Markow began to develop neurological problems in his upper and lower extremities. On November 20, 2010, due to “substantial sensory deficit” on one side of his body and “weakness” on the other, Markow was rushed to Cedars’s emergency room. Over the course of the next several weeks, Markow’s condition deteriorated, eventually leaving him quadriplegic. Markow remained hospitalized for approximately the next two years.
*1036 In the weeks and months immediately following the paralysis, physicians at Cedars conducted a “very exhaustive] and thorough workup” to determine the cause of Markow’s condition. The physicians believed that Markow’s condition was “ultimately” due to a “cervical cord infarct,” i.e., a stroke in the cervical spine, but they were unable to find evidence of any such stroke.
At the time of trial, Markow continued to suffer from the lancing facial pain, which is known as trigeminal neuralgia or trigeminal pain.
At trial, plaintiffs and their experts advanced two different causes for Markow’s paralysis: Either Rosner used an iodine-based contrast (Omnipaque) to which Markow was allergic or Rosner caused mechanical trauma to Markow’s cervical cord during the procedure.
With regard to their Omnipaque theory, plaintiffs presented evidence that although hospital records documented that Markow was allergic to iodine contrast and that Rosner had been aware of this allergy ever since he began treating Markow on May 15, 2006, Rosner, acting “in haste,” filled out an “intra-procedure” order requesting Omnipaque for the November 11, 2010 procedure. Plaintiffs further established that no change in the contrast was ever documented for the November 11, 2010 procedure, that plaintiffs were billed by Cedars for Omnipaque, and that the billing form is completed by nurses during the procedure.
As for their mechanical trauma theory, plaintiffs established that immediately following the procedure, Rosner told Markow that the reason he was experiencing intense pain in his face was because Rosner “may have hit something he shouldn’t have hit, touched something he shouldn’t have touched.” Plaintiffs’ expert neurologist testified that the slow onset of Markow’s quadriplegia was consistent with a vasospasm caused by a misplaced needle nicking the radicular artery that supplied the nerve root. The expert also testified that there was “objective evidence of trauma” because immediately following the procedure Markow suffered from trigeminal pain, and an MRI scan taken days after the procedure showed edema or swelling at the source of such pain, the trigeminal apparatus.
Rosner presented evidence that Markow’s quadriplegia resulted from a cervical stroke induced by a purely coincidental blood clot, as shown by the slow deterioration that Markow suffered following the procedure. Plaintiffs’ expert neurologist testified that the odds of such a stroke are one in 10,000.
*1037 5. Litigation and trial
Plaintiffs sued defendants for professional negligence and loss of consortium.[3] The trial court denied Cedars’s motion for summary judgment based upon lack of ostensible agency, finding that plaintiffs had submitted evidence from which “a jury could find . . . that Dr. Rosner is an agent of Cedars-Sinai.”
Using a special verdict form, the jury found Rosner “negligent in the diagnosis or treatment” of Markow and that his negligence was a substantial factor in causing Markow’s quadriplegia. The jury also found that Cedars was negligent in its treatment of Markow, but found its negligence was not a substantial factor in causing harm to Markow. The jury found Cedars vicariously liable for plaintiffs’ damages because it “intentionally or carelessly” created the impression that Rosner was its agent and Markow was harmed as a result of his reasonable belief that Rosner was Cedars’s agent. Although Rosner was the only defendant found to have caused Markow’s injuries, the jury, in direct contradiction of the special verdict’s instructions, allocated 60 percent of the fault to Rosner and 40 percent to Cedars. After reducing damages for noneconomic losses to $250,000 pursuant to Civil Code section 3333.2, plaintiffs’ damages award totaled $5.2 million.
6. Posttrial motions
Cedars requested the trial court to strike the apportionment of fault, while Rosner moved for a new trial on grounds including the inconsistency of the jury’s findings. The trial court denied Rosner’s motion and granted Cedars’s. It found that the jury erroneously answered the allocation question and struck the allocation of fault.
Cedars subsequently moved for judgment notwithstanding the verdict and for a new trial on several grounds, including that the verdict was contrary to law because the Conditions of Admissions conclusively established that Rosner was not Cedars’s ostensible agent. The trial court denied these motions.
Rosner and Cedars timely appealed, and we consolidated their separate appeals.
*1038 DISCUSSION
1. Cedars’s liability on basis of ostensible agency
a. Ostensible agency principles
“An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.” (Civ. Code, § 2300.) “A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.” (Civ. Code, § 2334.) “Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met: The person dealing with an agent must do so with a reasonable belief in the agent’s authority, such belief must be generated by some act or neglect by the principal sought to be charged[,] and the person relying on the agent’s apparent authority must not be negligent in holding that belief.” (J.L. v. Children’s Institute, Inc. (2009) 177 Cal.App.4th 388, 403-404 [99 Cal.Rptr.3d 5].)
Where a patient seeks to hold a hospital liable for the negligence of a physician, the doctrine of ostensible agency is now commonly expressed as having two elements: “(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff.” (Mejia v. Community Hospital of San Bernardino (2002) 99 Cal.App.4th 1448, 1453 [122 Cal.Rptr.2d 233] (Mejia).) Generally, the first element is satisfied “when the hospital ‘holds itself out’ to the public as a provider of care,” “unless it gave the patient contrary notice.” (Id. at pp. 1453-1454.) Nonetheless, a hospital’s “contrary notice” may be insufficient “to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information.” (Id. at p. 1454.) Reliance upon an apparent agency is demonstrated “when the plaintiff ‘looks to’ the hospital for services, rather than to an individual physician.” (Ibid.) Ultimately, “there is really only one relevant factual issue: whether the patient had reason to know that the physician was not an agent of the hospital. As noted above, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or because the patient was treated by his or her personal physician—ostensible agency is readily inferred.” (Id. at pp. 1454-1455.)
*1039 Although the existence of an agency relationship is usually a question of fact, it “becomes a question of law when the facts can be viewed in only one way.” (Metropolitan Life Ins. Co. v. State Bd. of Equalization (1982) 32 Cal.3d 649, 658 [186 Cal.Rptr. 578, 652 P.2d 426].) In the physician-hospital-patient context, ostensible agency is a factual issue “[ujnless the evidence conclusively indicates that the patient should have known that the heating physician was not the hospital’s agent, such as when the patient is treated by his or her personal physician” or received actual notice of the absence of any agency relationship. (Mejia, supra, 99 Cal.App.4th at pp. 1454, 1458.)
b. Because Markow received actual notice and was treated in a nonemergency context, there was no ostensible agency and Cedars was entitled to judgment as a matter of law.
It was undisputed that on 25 occasions over the course of four and one-half years Markow received, read (until he realized that he recognized the language as the same used in forms he had previously read), signed, and initialed Conditions of Admissions forms that informed him that “physicians are independent contractors and are neither employed by nor agents of this facility. Patient recognizes that Physicians furnishing services to the Patient, including without limitation . . . anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes” (Oct. 2003 Conditions of Admissions form); “physician groups include, but are not limited to: . . . General Anesthesia Specialists Partnership Medical Group” (July 15, 2006 Conditions of Admissions form); and “All physicians and surgeons furnishing services to the Patient, such as radiologists, pathologists, anesthesiologists and the like, are independent contractors and are not employees or agents of the Hospital” (July 15, 2006 Conditions of Admissions form). Although the Conditions of Admissions forms also address a number of other topics, the disclaimer section stood out prominently on the first page of both versions of the form, in part because it was printed in a larger pitch than the other paragraphs in the form. Moreover, the disclaimer section was the only portion of either form requiring the patient to initial it. On the October 2003 Conditions of Admissions form, the disclaimer also stood out because it was in boldface print. On the July 2006 version of the Conditions of Admissions form in use for most of the period of 2007 through 2010, the disclaimer paragraph was even more prominent and distinctive because it was followed by a large rectangle in which the patient was to place his or her initials.
The wording of the disclaimer in each form, particularly in the version of the form in use from 2007 through 2010, was simple and unambiguous, not obtuse “legalese.” Although plaintiffs and the dissent argue that the form *1040 failed to specify whether physicians who were also directors of practice areas such as the pain center were independent contractors, the language in each version of the form clearly included all physicians. The 2006 version initially stated, “In accordance with California law which prohibits the Corporate practice of Medicine, physicians are independent contractors and are neither employed by nor agents of this facility.” It then continued to specify, “Patient recognizes that Physicians furnishing services to the Patient, including without limitation . . . anesthesiologists, are all independent contractors with Patient for the purposes of the provision of professional services and are not employees or agents of Cedars-Sinai Medical Center for such purposes.” This language did not limit the category of independent contractor physicians to any subgroup, such as those who were not directors of practice areas, but expressly included all physicians furnishing services to patients, including anesthesiologists, which is Rosner’s field of specialization. The form then went on to specify Rosner’s practice group, GASP, as one of the “physician groups.” Although Markow may not initially have known that GASP was Rosner’s practice group, he had reason to know this upon receiving a bill from GASP for Rosner’s services. The Conditions of Admissions form as amended in July 2006 was also all-inclusive: “A// physicians and surgeons furnishing services to the Patient, such as . . . anesthesiologists and the like, are independent contractors and are not employees or agents of the Hospital.” (Italics added.) This language is simply not susceptible to an interpretation that would exclude Rosner, an anesthesiologist, because he was the director of the pain center.
In addition, Markow signed at least eight “Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions” forms prior to and on the date of the injurious procedure, and in each of these he again acknowledged that “persons in attendance at such operation or procedures as indicated above, for the purpose of administering anesthesia, and the person or persons performing other specialized professional services, such as radiology, pathology, and the like, are not the agents, servants or employees of Cedars-Sinai Medical Center, but are independent contractors performing specialized services on my behalf and, as such, are the agents of myself.” When Rosner performed procedures on Markow to alleviate his pain, Rosner was a person in attendance for the purpose of performing specialized professional services. Thus, for every procedure, Markow signed at least one, and sometimes two forms acknowledging his receipt of actual notice that Rosner was an independent contractor, not an agent or employee of Cedars.
Furthermore, although Rosner’s affiliation with Cedars, in conjunction with the allure of Cedars’s reputation, played a significant role in Markow’s decision to be treated by Rosner, it was undisputed that Markow chose Rosner to be his physician. Markow did not go to Cedars seeking care from *1041 its emergency room, as in many of the reported decisions upholding a finding of ostensible agency or concluding that ostensible agency was a factual issue for the jury. (See, e.g., Whitlow v. Rideout Memorial Hospital (2015) 237 Cal.App.4th 631 [188 Cal.Rptr.3d 246] (Whitlow) [reversing summary judgment for hospital]; Mejia, supra, 99 Cal.App.4th 1448 [reversing judgment after nonsuit].) Nor was Rosner a physician on call who attended to Markow after he was admitted to the hospital, without Markow having a choice or say in the matter. Instead, once treatment commenced and on the date of the injurious procedure, Rosner was one of Markow’s personal physicians, i.e., Cedars did not assign Rosner to treat Markow; Markow chose Rosner. GASP billed Markow for Rosner’s services and Markow paid for Rosner’s services by paying GASP, not Cedars.[4] GASP was also specifically mentioned in the disclaimer section of the original Conditions of Admissions form prior to amendment in July 2006.
Accordingly, Markow indisputably either knew or should have known, based upon the Conditions of Admissions forms that he initialed and signed on multiple occasions, the “Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions” forms that he also signed on at least eight occasions, and Rosner’s status as Markow’s personal physician, that Rosner was not Cedars’s agent or employee, but was instead an independent contractor.[5] Because the evidence conclusively indicates that Markow knew or at least should have known that Rosner was not Cedars’s agent, this is an issue of law, not fact. (Mejia, supra, 99 Cal.App.4th at pp. 1454, 1458.)
Plaintiffs cite a variety of factors to support their ostensible agency theory, such as the contents of Cedars’s Web site identifying Rosner as the director of its pain clinic and inviting would-be patients to phone 1-800-CEDARS-1; the location of the pain clinic in a building owned by Cedars and displaying Cedars’s name and logo; Rosner’s use, with Cedars’s authorization, of Cedars’s name and logo on his business cards and correspondence with physicians;[6] Cedars’s ownership of the pain clinic’s equipment and supplies *1042 and employment of nurses and other pain clinic staff;[7] Rosner’s Cedars badge; and that Cedars recruited Rosner from the East Coast to be the director of the pain clinic. Assuming, for the sake of argument, that Markow had knowledge of and relied upon each of these factors, they are nonetheless negated by the actual notice Cedars provided Markow that Rosner was an independent contractor, not Cedars’s agent or employee and Markow’s express acknowledgement of receipt of such notice on the multiple Conditions of Admissions forms, not to mention the Authorization for & Consent to Surgery or Special Diagnostic or Therapeutic Procedures or Blood Transfusions forms and Rosner’s status as Markow’s personal physician.
Plaintiffs rely upon a number of distinguishable cases. In most of these cases, the defendant did not give the plaintiff notice of the lack of agency or employment. (Stanhope v. L. A. Coll. of Chiropractic (1942) 54 Cal.App.2d 141 [128 P.2d 705]; Ermoian v. Desert Hospital (2007) 152 Cal.App.4th 475 [61 Cal.Rptr.3d 754]; Quintal v. Laurel Grove Hospital (1964) 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161]; Jacoves v. United Merchandising Corp. (1992) 9 Cal.App.4th 88 [11 Cal.Rptr.2d 468] (Jacoves).) Others (Stanhope, supra, 54 Cal.App.2d 141; Whitlow, supra, 237 Cal.App.4th 631) involve patients seeking care in an emergency room context where, as noted in Mejia, supra, 99 Cal.App.4th at page 1454, “an injured patient in need of immediate medical care cannot be expected to understand or act upon that information.” In Mejia itself, the injured patient sought treatment in an emergency room and the hospital did not provide her any notice that the physicians were not its agents or employees. The appellate court concluded that “absent evidence that plaintiff should have known that the [allegedly negligent physician] was not an agent of respondent hospital, plaintiff has alleged sufficient evidence to get to the jury merely by claiming that she sought treatment at the hospital.” (Id. at p. 1460.)
Although notice that physicians were independent contractors was given in Whitlow, supra, 237 Cal.App.4th 631, both in a Conditions of Admissions form and on a sign on the wall of the emergency room registration area, the patient was suffering excruciating pain from a brain hemorrhage and was unable to read the Conditions of Admissions form. Moreover, no one read it to her. (Id. at pp. 633-634.) Under those circumstances, the appellate court rejected “the notion that a signature on an admissions form conclusively constitutes notice to a patient seeking care in an emergency room that the treating physician, whom she did not choose and did not know, is not an agent of the hospital.” (Id. at p. 641, italics added.)
Finally, in Kaplan v. Coldwell Banker Residential Affiliates, Inc. (1997) 59 Cal.App.4th 741 [69 Cal.Rptr.2d 640], an experienced real estate investor *1043 who was also a superior court judge sued Coldwell Banker, as well as his broker (a Coldwell Banker franchisee) and others when he discovered misrepresentations regarding a property he had purchased. (Id. at p. 744.) Coldwell Banker required every franchisee to hold himself or herself out to the public as “ ‘independently owned and operated member[s] of Coldwell Banker Residential Affiliates, Inc.’ ” (Ibid.) The broker in question had printed this disclaimer language on his advertising, but in much smaller print than the name “Coldwell Banker.” {Ibid.) This appears to have been in accordance with the requirements of the Coldwell Banker Identity Manual, a page from which was attached as an appendix to the appellate opinion. This page depicted sample “Exterior Signage” with “Coldwell Banker” in very large letters, the name of the franchisee in somewhat smaller letters, and the independent contractor disclaimer in very tiny letters at the bottom. (Id. at pp. 744, fn. 1, 749.) The plaintiff “testified that he ‘went for the sign,’ [and] did not notice the disclaimer language.” (Id. at p. 744.) Here, however, the disclaimer was not hidden in fine print amidst other, more prominent language. It was in larger print and either in boldface print or right above a large rectangle in which the patient was to place his or her initials. It was also the only portion of the Conditions of Admissions form that required the patient to initial it. Unlike Kaplan, who did not see the fine-print disclaimer, Markow saw Cedars’s disclaimer, read it a number of times, and initialed it each time he was presented with a Conditions of Admissions form.
The dissent relies upon a federal trial court case,[8] Romar v. Fresno Community Hosp. and Medical Center (E.D.Cal., Mar. 23, 2007, No. CIV F 03-6668 AWI SMS) 2007 WL 911882, in support of its position that the Conditions of Admissions forms were ambiguous regarding whether physicians who were directors of practice areas or administrative units were also independent contractors. (Dis. & cone. opn. at p. 1059, post.) However, the only potentially negligent personnel in Romar were physician assistants and nurse practitioners. The “Conditions Form” stated that “[a]ll physicians and surgeons” were independent contractors, but was silent regarding physician assistants and nurse practitioners. (Romar, at p. *2.) Neither a physician’s assistant nor a nurse practitioner falls within the scope of “[a]ll physicians and surgeons” because neither is a physician, let alone a surgeon. However, a physician who is the director of a practice area or administrative unit clearly falls within the scope of the phrases used in the Conditions of Admissions forms presented to Markow, i.e., “physicians,” “Physicians providing services,” and “all physicians and surgeons furnishing services to the Patient.”
*1044 In a related argument, the dissent also relies upon Jacoves, supra, 9 Cal.App.4th 88, for the proposition that “dual status physicians” such as Markow may be agents of the hospital. (Dis. & conc. opn. pp. 1058-1059, post.) However, unlike this case, the hospital in Jacoves did not provide the plaintiff with any notice that the physicians were independent contractors, not agents or employees. Here, in contrast, any inference of agency or employment arising from Rosner’s status as director of the pain clinic was negated by the unambiguous and prominent disclaimer Markow repeatedly initialed.
The dissent also cites a second federal trial court case, Van Horn v. Hornbeak (E.D.Cal., Feb. 18, 2010, No. CIV F 08-1622 LJO DLB) 2010 WF 599885, in support of its view that the Conditions of Admissions forms did not provide Markow with notice as a matter of law. (Dis. & cone. opn. at pp. 1061-1062, post.) Van Horn, a pregnant state prison inmate, was taken to a hospital four times: The first three visits were to the emergency room and on the fourth visit she was in labor. On each occasion she signed a Conditions of Admissions form stating that all physicians and surgeons furnishing services to patients were independent contractors. (Van Horn, at p. *2.) The trial court denied the hospital’s summary judgment motion, stating: “[Pjlaintiff made a sufficient showing on the question of ostensible agency to avoid summary judgment. Plaintiff declared that she had no reason to believe that [the physicians] were not hospital employees, that she believed they were, ‘and was never told otherwise.’ She was shackled, in pain, and ‘forced’ to sign the forms.” (Id. at p. *10.) Van Horn thus represents an aggravated form of an emergency room case. Not only was the plaintiff seeking care in an emergency room on her first three visits, she was literally a prisoner in shackles. She had no choice in where to seek treatment, but was instead at the mercy of prison authorities and was “forced” to sign the form or, presumably, forgo medical care. Markow, however, was not a prisoner and chose Rosner to treat him. If Markow found Rosner’s independent contractor status unacceptable, he was free to leave and seek treatment elsewhere—a course of action not available to inmate Van Horn.
None of the cases relied upon by the plaintiffs and the dissent addressed treatment of a patient by his own physician in a nonemergency context where the patient repeatedly read and initialed a prominent notice that his physician was an independent contractor, not an agent or employee of the hospital. Accordingly, none of these cases supports the proposition that ostensible agency remains a factual issue where the patient knew or should have known that his physician was not the hospital’s agent. We conclude the jury’s ostensible agency finding is contrary to law.
A trial court may grant a motion for judgment notwithstanding the verdict only if the evidence, viewed most favorably to the prevailing party, is *1045 insufficient to support the verdict. (Cadam v. Somerset Gardens Townhouse HOA (2011) 200 Cal.App.4th 383, 388 [132 Cal.Rptr.3d 617].) Generally, an appellate court reviews a trial court’s ruling on such a motion for sufficiency of the evidence supporting the verdict. (Ibid.) However, review is de novo “[i]f the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions.” (Wolf v. Wall Disney Pictures & Television (2008) 162 Cal.App.4th 1107, 1138 [76 Cal.Rptr.3d 585].) Here, all of the facts essential to the issue of ostensible agency were undisputed. The only issue was whether Markow’s purported conclusion that Rosner was Cedars’s agent was reasonable, which is a question of law. (Mejia, supra, 99 Cal.App.4th at pp. 1454, 1458.) Accordingly, after de novo review, we conclude that the jury’s finding of ostensible agency was contrary to the law, and the trial court should have granted Cedars’s motion for judgment notwithstanding the verdict. We therefore reverse the judgment as to Cedars.
2. Sufficiency of the evidence
Rosner contends the verdict was not supported by substantial evidence.
a. Standard of review
In reviewing the sufficiency of evidence to support the jury’s finding, we review the record in the fight most favorable to the prevailing party, resolving in favor of the prevailing party all conflicts in either the evidence or the reasonable inferences to be drawn therefrom, to determine whether the record contains substantial evidence, contradicted or uncontradicted, supporting the finding. (State Farm Fire & Casualty Co. v. Jioras (1994) 24 Cal.App.4th 1619, 1625-1626 [29 Cal.Rptr.2d 840]; Hasson v. Ford Motor Co. (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857], overruled on another ground in Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) “ ‘Substantial evidence’ is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.” (Roddenberry v. Roddenberry (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].) ‘“The focus is on the quality, rather than the quantity, of the evidence.” (Ibid.) ‘“Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.” (Ibid.) ‘“The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in fight of the whole record.” (Id. at p. 652.) The testimony of a single witness may be sufficient. (Dart Industries, Inc. v. Commercial Union Ins. Co. (2002) 28 Cal.4th 1059, 1075 [124 Cal.Rptr.2d 142, 52 P.3d 79].)
*1046 b. The jury’s negligence finding was supported by substantial evidence.
Plaintiffs presented undisputed evidence that Rosner erred by ordering an iodine-containing contrast, Omnipaque, for the November 11, 2010 procedure. In addition, plaintiffs presented evidence which strongly suggested that this initial error was not corrected. There was no documentation showing that an iodine-free contrast was substituted for the Omnipaque before the procedure. Moreover, there was undisputed evidence that plaintiffs were billed for Omnipaque and only Omnipaque—that is, plaintiffs were not inadvertently billed for two contrasts, one containing iodine and one iodine-free contrast. In addition, plaintiffs’ pain management expert testified that delayed hypersensitivity reactions to iodine agents, such as Omnipaque, are quite common and typically occur six to 10 days later. Such a delay in this case would be consistent with the nine-day interval between November 11, 2010, the day of the procedure, and November 20, 2010, the day when Markow was rushed back to Cedars.
With respect to the alternate theory that Markow was injured by means of negligent mechanical trauma, it was undisputed that Markow suffered from trigeminal nerve pain immediately upon awakening from the procedure. It was further undisputed that such pain was unprecedented for Markow. Although he had received many similar treatments lower on his cervical spine, he had never previously experienced thousands of “hot lancets” in his face. In addition, an MRI scan taken upon Markow’s return to Cedars on November 20, 2010, revealed that there was swelling at the trigeminal apparatus. Plaintiffs’ expert neurologist testified that the swelling was “objective evidence of trauma,” and that the chances of Markow suffering a purely coincidental stroke in his cervical spine at or around the same time he underwent the November 11, 2010 procedure were one in 10,000.
Rosner contends that the jury’s verdict was not supported by substantial evidence because plaintiffs’ experts could not definitively state whether an allergic reaction to the iodine contrast or mechanical trauma caused Markow’s paralysis and conceded that a coincidental stroke was a possibility. Plaintiffs and their experts, however, were not required to rule out all causes but one. “Under the applicable substantial factor test, it is not necessary for a plaintiff to establish the negligence of the defendant as the proximate cause of injury with absolute certainty so as to exclude every other possible cause of a plaintiffs illness . . . .” (Cooper v. Takeda Pharmaceuticals America, Inc. (2015) 239 Cal.App.4th 555, 578 [191 Cal.Rptr.3d 67].) Instead, plaintiffs were only required to “ ‘offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is more probable than not the *1047 negligent act was a cause-in-fact of the plaintiffs injury.’ ” (Ibid.) Plaintiffs met this burden. Their experts offered reasoned explanations for how Rosner’s negligence caused Markow’s quadriplegia: Either Rosner used Omnipaque or he inflicted some form of mechanical trauma on Markow during the November 11, 2010 procedure.
In short, we find that the jury’s verdict was supported by evidence that was reasonable, credible, and of solid value.
3. Failure to require findings on plaintiffs’ alternate theories of negligence
Rosner also contends the special verdict form should have included questions that would have addressed plaintiffs’ different negligence theories.
“[A] special verdict is that by which the jury find the facts only, leaving the judgment to the court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the court but to draw from them conclusions of law.” (§ 624.) “ ‘Unlike a general verdict (which merely implies findings on all issues in favor of the plaintiff or defendant), a special verdict presents to the jury each ultimate fact in the case. The jury must resolve all of the ultimate facts presented to it in the special verdict, so that “nothing shall remain to the court but to draw from them conclusions of law.” ’ ” (Myers Building Industries, Ltd. v. Interface Technology, Inc. (1993) 13 Cal.App.4th 949, 959-960 [17 Cal.Rptr.2d 242].)
The special verdict form used in this case properly required the jury to make findings only as to ultimate facts for plaintiffs’ sole cause of action. Including questions that separately addressed each of plaintiffs’ theories of negligence would have required the jury to decide evidentiary facts, in contravention of section 624.
Rosner’s reliance on Valentine v. Baxter Healthcare Corp. (1999) 68 Cal.App.4th 1467 [81 Cal.Rptr.2d 252] is misplaced. In Valentine, the Court of Appeal held that it was proper to pinpoint the plaintiffs’ distinct negligence theories even though there was only a single cause of action, but it did so only because of exceptional circumstances—there had already been two trials and two verdicts: “This was a case calling for special verdicts that would pinpoint the jury’s fact finding and enable judgment to be entered rather than prolonging litigation with a possible third trial.” (Id. at p. 1488.)
4. Inconsisten t findings in special verdict
Rosner contends he was entitled to a new trial because the special verdict was hopelessly ambiguous, in that the jury concluded both that Cedars’s *1048 negligence was not a cause of Markow’s injuries and that it was a cause of 40 percent of his injuries. Rosner argues the trial court erred by choosing one of these findings over the other.
a. Standard of review
“A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency.” (Singh v. Southland Stone, U.S.A., Inc. (2010) 186 Cal.App.4th 338, 357-358 [112 Cal.Rptr.3d 455], fn. omitted.) ‘“On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, ... a reviewing court will not infer findings to support the verdict. [Citations.] ‘ “ ‘Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.’ ” ’ ” (Id. at p. 358.)
b. The special verdict was not hopelessly ambiguous.
The trial judge instructed the jury: “I will give you a verdict form with questions you must answer. I’ve already instructed you on the law that you are to use in answering these questions. You must follow my instructions and the form carefully. You must consider each question separately. [¶] Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear. After you answer a question, the form tells [you what] to do next.”
Question 6 on the verdict form asked: ‘“Was Howard Rosner, M.D.’s negligence a substantial factor in causing harm to Michael Markow?” The jury answered yes. Question 8 on the verdict form asked: ‘“Was Nirmala Thejomurthy, M.D.’s negligence a substantial factor in causing harm to Michael Markow?” The jury did not answer this question, having found that Dr. Thejomurthy was not negligent in the first place. Question 10 on the verdict form asked: ‘“Was Cedars-Sinai Medical Center’s negligence a substantial factor in causing harm to Michael Markow?” The jury answered no.
Question 16 on the verdict form was preceded by the following direction: ‘“If the jury found more than one defendant liable for Plaintiffs’ injuries, i.e. the jury previously answered yes to more than one of these questions: 6, 8, and 10, answer the following, for each defendant(s) that the jury found to be *1049 negligent. [¶] The names of all three defendants are provided in this question. If you did not find that a particular defendant was liable for Plaintiffs’ injuries (i.e. the particular defendant was not negligent and/or the defendant’s negligence was not a substantial factor in causing harm), then please do not assign a percentage of fault to that defendant.” Although the jury had not ‘“previously answered yes to more than one of these questions: 6, 8, and 10,” the jury answered question 16, apportioning fault 60 percent to Rosner and 40 percent to Cedars.
Question 16 was included on the special verdict form because Civil Code section 1431.2, subdivision (a), enacted in 1986 as part of Proposition 51, provides as follows: ‘“In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant’s percentage of fault . . . .” (Italics added.) However, such an allocation does not apply to defendants whose liability is vicarious. (Diaz v. Carcamo (2011) 51 Cal.4th 1148, 1156-1157 [126 Cal.Rptr.3d 443, 253 P.3d 535].)
Cedars’s liability (as found by the jury) was based on ostensible agency, not comparative fault. The jury’s allocation of any percentage of fault to Cedars was therefore improper, as well as contrary to the court’s directions on the special verdict form. This does not mean, however, that the verdict was hopelessly ambiguous and a new trial was required. A similar claim was made and rejected on very similar facts in Miller v. Stouffer (1992) 9 Cal.App.4th 70 [11 Cal.Rptr.2d 454], in which a jury acted on its own initiative to allocate fault between the driver of a vehicle that struck a pedestrian and the driver’s employer, who also owned the car. The jury had found that the driver acted negligently and was acting within the course and scope of her employment when she struck the plaintiff. (Id. at pp. 75-76.) On appeal the employer contended that the verdict was “ ‘hopelessly ambiguous’ ” because even though “there was no claim of fault or direct liability against” her, “the jury allocated 40 percent of the negligence to her and also found her vicariously liable for the accident.” (Id. at p. 86.) The court rejected her contention, explaining that because the trial court granted the plaintiff’s “motion for JNOV and allocated 100 percent of the liability for negligence to [the employee], making [the employer’s] liability purely vicarious,” there was no ambiguity warranting retrial. (Ibid.) Here, too, the trial court eliminated the ambiguity by giving effect to the jury’s ostensible agency finding and striking the jury’s improper allocation of fault.
Rosner principally relies on Scott v. C. R. Bard, Inc. (2014) 231 Cal.App.4th 763 [180 Cal.Rptr.3d 479] and Mendoza v. Club Car, Inc. (2000) 81 *1050 Cal.App.4th 287 [96 Cal.Rptr.2d 605], both of which addressed a comparative fault allocation among directly liable tortfeasors. These cases are therefore inapposite to a jury’s improper attempt to allocate fault between a directly liable defendant and a vicariously liable defendant.
Accordingly, we hold that the trial court was not required to grant a new trial, but instead acted properly to eliminate the ambiguity or inconsistency by striking the jury’s apportionment of fault.
5. Excessiveness of future economic damages
The jury awarded Markow $4.5 million for future economic loss, which included $1.3 million for the cost of future hospitalizations. Rosner contends he is entitled to a new trial on plaintiffs’ future economic damages because the jury’s award for future hospitalizations is excessive, in that “plaintiffs’ expert did not consider amounts actually paid for hospitalization.”
a. Standard of review
“ ‘Whether a plaintiff “is entitled to a particular measure of damages is a question of law subject to de novo review. [Citations.] The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence.” ’ ” (Bermudez v. Ciolek (2015) 237 Cal.App.4th 1311, 1324 [188 Cal.Rptr.3d 820] (Bermudez).)
b. Substantial evidence supported the award for the cost of future hospitalizations.
The jury in this case was properly instructed with CACI No. 3903A, which directs the jury to determine “the reasonable cost of reasonably necessary medical care that [Markow] is reasonably certain to need in the future.” (See Civ. Code, §§ 3283 [damages may be awarded for “detriment . . . certain to result in the future”], 3359 [“[d]amages must, in all cases, be reasonable”]; Corenbaum v. Lampkin (2013) 215 Cal.App.4th 1308, 1330 [156 Cal.Rptr.3d 347].)
Our Supreme Court has endorsed a market or exchange value as the proper way to think about the reasonable value of medical services. (Howell v. Hamilton Meats & Provisions, Inc. (2011) 52 Cal.4th 541, 556 [129 Cal.Rptr.3d 325, 257 P.3d 1130].) This applies to the calculation of future medical expenses. (Corenbaum v. Lampkin, supra, 215 Cal.App.4th at pp. 1330-1331.) For insured plaintiffs, the reasonable market or exchange value of medical services will not be the amount billed by a medical provider *1051 or hospital, but the “amount paid pursuant to the reduced rate negotiated by the plaintiffs insurance company.” (Bermudez, supra, 237 Cal.App.4th at p. 1332, italics added.)
Plaintiffs’ life-care planning expert,[9] Tricia West, R.N., estimated that the amount billed for Markow’s future hospitalizations would be approximately $2 million. Based on her research, knowledge, and experience, West testified that the amount actually paid is usually 50 to 75 percent of the total amount billed.[10] West also testified that with respect to one particular hospitalization, the cost was reimbursed at a much lower rate of 12.9 percent. The jury’s award of $1.3 million is approximately 65 percent of the estimated future billing amount of $2 million, or roughly halfway between the 50 to 75 percent reimbursement testified to by West.
In his motion for a new trial and on appeal, Rosner argues that the jury’s award of $1.3 million is excessive, that the jury should have applied the 12.9 percent reimbursement rate from that one hospital stay, not the 50 to 75 percent offered by West. If the jury had utilized the 12.9 percent rate, the award for future hospitalizations would have been reduced to $260,000.
Substantial evidence supports the jury’s award. While West acknowledged that in one instance a hospital accepted a reimbursement rate much lower than 50 to 75 percent, she also testified that reimbursement rates vary and that there is no one “across-the-board, set percentage.” West testified that she has been doing life care planning for almost seven years. In addition to her experience as a life-care planner, she has a bachelor’s degree in critical care nursing, and a master’s degree in business administration with a specialty in health care management; she is also a certified hemodialysis nurse and is licensed as both an R.N. and a public health nurse. The jury could reasonably find West’s testimony on the reimbursement rate to be credible. Accordingly, we find that substantial evidence supports the jury’s award of future economic damages.[11]
*1052 6. Section 998 costs
More than six months before trial, plaintiffs jointly served Rosner with a single offer to compromise their claims for $999,999.99 pursuant to section 998. The offer did not allocate the settlement funds between Markow and his wife. Moreover, the offer was conditioned on the accuracy of Rosner’s representation that he had only $1 million in insurance coverage for plaintiffs’ claims. Because Rosner rejected this offer and plaintiffs were awarded more than $1 million, they sought to recover section 998 costs from Rosner. Rosner moved to strike plaintiffs’ costs claim on the ground the settlement offer was invalid because it was joint and conditional. The trial court denied the motion. Rosner contends that the trial court erred by denying his motion.
a. Standard of review
The interpretation and applicability of a statute is a question of law, which we review de novo. (Barella v. Exchange Bank (2000) 84 Cal.App.4th 793, 797 [101 Cal.Rptr.2d 167] (Barella).) “In interpreting section 998, this court has placed squarely on the offering party the burden of demonstrating that the offer is a valid one under section 998.” (Barella, at p. 799.)
b. Plaintiffs’ joint section 998 offer to Rosner was valid.
Rosner’s argument that plaintiffs’ joint section 998 offer is invalid is based on the language of section 998, subdivision (d): “If an offer made by a plaintiff is not accepted . . . .” (Italics added.)
“The first rule of statutory construction is, of course, that a statute should be construed to effectuate the intention of the Legislature in enacting it.” (Fortman v. Hemco, Inc. (1989) 211 Cal.App.3d 241, 262 [259 Cal.Rptr. 311] (Fortman).) “As recognized in numerous Court of Appeal decisions, the clear purpose of section 998 and its predecessor, former section 997, is to encourage the settlement of lawsuits prior to trial.” (T. M. Cobb Co. v. Superior Court (1984) 36 Cal.3d 273, 280 [204 Cal.Rptr. 143, 682 P.2d 338].) “The purpose of section 998 is to encourage the settlement of lawsuits before trial by penalizing a party who fails to accept a reasonable offer from the other party.” (Taing v. Johnson Scaffolding Co. (1992) 9 Cal.App.4th 579, 583 [11 Cal.Rptr.2d 820].)
Joint settlement offers are not necessarily invalid. (Fortman, supra, 211 Cal.App.3d at p. 263.) “An offer of settlement must be certain, and when an offer is made jointly, the offeree must be able to evaluate the likelihood of each offeror receiving a more favorable verdict at trial.” (Persson v. Smart Inventions, Inc. (2005) 125 Cal.App.4th 1141, 1170 [23 Cal.Rptr.3d 335].) *1053 Deocampo v. Ahn (2002) 101 Cal.App.4th 758 [125 Cal.Rptr.2d 79] (Deocampo) upheld the validity of a joint offer to compromise made by two plaintiffs: a man rendered a paraplegic by the defendant’s medical malpractice and his wife (asserting a loss of consortium claim). The court stated: “[Plaintiff’s wife could only have recovered a maximum of $250,000 on her cause of action. Thus, the bulk of plaintiffs’ section 998 offer was obviously meant for plaintiff himself. Moreover, the trial court could not have been confused about whether plaintiff obtained a more favorable judgment than that for which he offered to settle. Since the jury did not award plaintiff’s wife any damages, it is clear that the damages the jury did award are far greater than the amount requested in the section 998 offer, less the maximum $250,000 that plaintiff’s wife could have recovered.” (Id. at p. 777.)
Similarly, joint section 998 offers by multiple plaintiffs were held to be valid in Johnson v. Pratt & Whitney Canada, Inc. (1994) 28 Cal.App.4th 613, 630 [34 Cal.Rptr.2d 26]; Stallman v. Bell (1991) 235 Cal.App.3d 740, 747 [286 Cal.Rptr. 755]; and Fortman, supra, 211 Cal.App.3d at page 263.
The joint offer in this case did not preclude a determination of whether plaintiffs received a more favorable judgment. Plaintiffs offered to settle the case for just under $1 million, yet the jury awarded them $5.2 million. Thus, it is clear that plaintiffs were awarded far more than they would have received from their joint settlement offer. Moreover, as held in Atkins v. Strayhorn (1990) 223 Cal.App.3d 1380, 1394 [273 Cal.Rptr. 231], and noted in Deocampo, supra, 101 Cal.App.4th at page 111, the spouse could recover a maximum of $250,000 on her loss of consortium claim pursuant to Civil Code section 3333.2. This statutory limit provided a further guideline for assessing the certainty and validity of plaintiffs’ offer to compromise. Accordingly, we hold that their section 998 offer was not invalid because it was jointly made.
c. Plaintiffs' conditional section 998 offer to Rosner was valid.
Rosner also argues that the section 998 offer was invalid because it was conditioned on the accuracy of Rosner’s disclosures regarding his insurance coverage for plaintiffs’ claims.
“An offer to compromise under Code of Civil Procedure section 998 must be sufficiently specific to allow the recipient to evaluate the worth of the offer and make a reasoned decision whether to accept the offer. [Citations.] Any nonmonetary terms or conditions must be sufficiently certain and capable of valuation to allow the court to determine whether the judgment is more favorable than the offer.” (Fassberg Construction Co. v. Housing Authority of City of Los Angeles (2007) 152 Cal.App.4th 720, 764 [60 Cal.Rptr.3d 375] (Fassberg))
*1054 As Rosner acknowledges, Deocampo, supra, 101 Cal.App.4th 758, upheld the validity of a settlement offer conditioned on the accuracy of the offeree’s discovery responses regarding the amount of insurance coverage for the plaintiffs’ claims. The Deocampo court explained: “The provision simply sought to hold [the doctor] to his discovery representation that he only had $1 million in insurance coverage for plaintiffs’ claims. Certainly litigants have a right to condition an offer to compromise on the accuracy of the information supplied by the offeree in discovery.” (Id. at p. 778.) We agree. Plaintiffs’ section 998 offer was not invalid merely because it was conditioned on the accuracy of Rosner’s disclosures regarding his insurance coverage for plaintiffs’ claims. This nonmonetary condition was sufficiently certain and capable of valuation to allow the court to accurately assess the offer.
The cases Rosner relies upon are distinguishable in that none of them involved an offer to compromise conditioned on the accuracy of the offeree’s discovery responses. (See Menees v. Andrews (2004) 122 Cal.App.4th 1540, 1543-1546 [19 Cal.Rptr.3d 664] [defense offer conditioned on acceptance by all plaintiffs invalid]; Fassberg, supra, 152 Cal.App.4th at pp. 765-767 [offer conditioned on releases by, and releases of claims against “ ‘a long list of other possible, ill-defined third parties’ ” not overbroad or incapable of valuation absent indication such parties possessed valid claim]; Barella, supra, 84 Cal.App.4th at p. 801 [offer conditioned on confidentiality invalid in defamation action].)
Accordingly, the trial court properly awarded plaintiffs section 998 costs.
DISPOSITION
The judgment is affirmed with respect to Rosner and reversed with respect to Cedars-Sinai. Plaintiffs are awarded costs with respect to Rosner’s appeal. Cedars-Sinai is awarded costs with respect to its appeal.
Rothschild, P. J., concurred.

 Undesignated statutory references are to the Code of Civil Procedure.

 Rosner testified that of the approximately 1,500 nerve block procedures that he performs per year, only six are done at the C1-C2 levels in the cervical spine.

 Plaintiffs also sued anesthesiologist Nirmala Thejomurthy, M.D., but the jury found that she was not negligent.

 The record reflects Markow’s payment of GASP’s bills prior to the date of the injurious procedure. Billing by and payment of GASP was consistent with the contents of the disclaimer, i.e., Rosner was an independent contractor with respect to Cedars. In contrast, there was no evidence that Cedars billed Markow for Rosner’s services.

 We do not intend to suggest that a patient must be advised of physicians’ independent contractor status more than once to receive adequate notice. Nonetheless, in this case Markow received and acknowledged receipt of 25 such advisements that consistently informed him that physicians were independent contractors.

 We note, however, that nothing indicated Markow saw Rosner’s correspondence with other physicians, which would be necessary to show reliance. Moreover, Markow did not testify that he relied upon the business cards or correspondence.

 Nothing indicated Markow knew who owned the equipment or provided the supplies.

 While such cases are citable, they do not constitute binding authority. (Gong v. City of Rosemead (2014) 226 Cal.App.4th 363, 375, 171 Cal.Rptr.3d 881.)

 Plaintiffs also had two other damages experts testify at trial: an economist and a physical therapy/rehabilitation expert. Defendants offered no expert testimony on plaintiffs’ damages.

 Between September 2011 and March 2014, Markow spent 245 days in the hospital, averaging 98 days per year. West estimated that due to professional in-home nursing care, Markow would average far fewer days in the hospital than before, only 28 days per year.

 Citing Sargon Enterprises, Inc. v. University of Southern California (2012) 55 Cal.4th 747, 753 [149 Cal.Rptr.3d 614, 288 P.3d 1237], Rosner also contends that West’s testimony was speculative. To the extent that Rosner’s argument on future hospital costs challenges the bases for West’s opinions, we hold that he waived this contention by, inter alia, not filing a motion in limine seeking to exclude West’s testimony. “We leave the question of how courts should fulfill their gatekeeper role in a case like the instant one for an appeal in which the parties have actually litigated the issue at trial.” (Bermudez, supra, 237 Cal.App.4th at p. 1340, italics added.)