Filed 6/9/15

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| DEAN WHITLOW et al., | C074810 |
| Plaintiffs and Appellants, | (Super. Ct. No. YCSCCVPO090000710) |
| v. | |
| RIDEOUT MEMORIAL HOSPITAL, | |
| Defendant and Respondent. | |

        APPEAL from a judgment of the Superior Court of Yuba County, Dennis J. Buckley, Judge.  Reversed.

        Wilcoxen Callaham, William M. Lyons, Michelle C. Jenni and Drew M. Widders for Plaintiffs and Appellants.

        Schuering Zimmerman & Doyle, Robert H. Zimmerman, Kia Jafari; Horvitz & Levy, Frederic D. Cohen and S. Thomas Todd for Defendant and Respondent.

---

*  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and III.

1

The trial court granted defendant Rideout Memorial Hospital's motion for summary judgment, finding that, as a matter of law, the emergency room physician who failed to diagnose and treat decedent's brain hemorrhage was not an ostensible agent of the hospital. On appeal, the surviving children argue that, despite the hospital's boilerplate admissions form and signage stating the emergency room physicians are independent contractors, they have presented triable issues of material fact whether their mother entrusted herself to the hospital, whether the hospital selected the physician, whether their mother reasonably believed the doctor was an agent of the hospital, and whether the form and signage could give notice of the employment status of the emergency room physician to a patient suffering acute pain at a meaningful time in a meaningful manner. Based on analogous cases in California and around the country, we agree and reverse the summary judgment of the children's wrongful death action.

## FACTS

Decedent's son, Dean Whitlow, submitted a declaration in opposition to the hospital's motion for summary judgment in which he described his mother's condition in the early morning hours of August 24, 2008. At approximately 1:00 a.m. his mother woke him up, screaming in pain that "she had the worst headache she had ever had in her life." Inconsolable and in excruciating pain, she begged him to take her to the hospital's emergency room. She vomited in the car en route to the hospital and again in the hospital restroom upon arrival. It was about 3:00 a.m. when they returned to the waiting room and she vomited yet again.

She complained of a headache with pain radiating to her neck. Initially she rated the pain at a 6 on a scale of 10, but within a short time she reported the pain at 10 of 10. She had high blood pressure, nausea, vomiting, and dizziness.

As she sat crying in horrible pain, a patient registration processor asked her to sign a "Conditions of Admission" form. Her son declared, "My mother was still suffering horribly, she was crying and she was nauseous and was unable to read the document. At

2

no time during the admission process was my mother capable of reading the admissions form, nor did she attempt to read the admissions form." He attests that at no time did the registration processor explain the contents of the admissions form or read it to her. She instructed his mother to sign the form and to initial it in certain places.

His mother complied. The form provided that "[a]ll physicians and surgeons furnishing services to the patient, including the radiologist, pathologist, anesthesiologist and the like, are independent contractors and are not employees or agents of the hospital." There was a sign on the wall of the registration area of the emergency department that stated: "Emergency physician services will be billed to you separately from the hospital's services."

Dr. Robert Martin diagnosed decedent with a muscle tension headache and discharged her at approximately 6:50 a.m. Her subjective description of her pain had diminished to a 5 out of 10. At 9:00 p.m. she fainted and was taken by ambulance to another hospital. She was transferred to UC Davis Medical Center, where she died two days later of a massive left temporal hemorrhage.

In a deposition, the patient registration processor testified that she did not remember decedent, whether decedent had read the form, or anything about decedent and her signing of the form. Nor did the registration processor remember if she followed the hospital's custom and practice to advise decedent of the physician's status as an independent contractor. She certainly did not have any recollection of decedent's mental acuity at the time she signed the form.

A neurosurgeon reviewed decedent's medical records and her son's declaration. He opined that at the time of decedent's admission to the hospital in the early morning hours of August 24, 2008, she was suffering from a massive left temporal hemorrhage and "was incapable of understanding the admissions form and/or incapable of

3

understanding what was contained in the form."[1]  A radiographic image of her brain taken at the second hospital confirmed decedent had a large left temporal intraparenchymal hemorrhage.

In deposition, Dr. Martin testified that the insignia on the clothing he was wearing while treating decedent identified him as an employee of "California Emergency Physicians."

The trial court granted the hospital's motion for summary judgment.  Relying on decedent's signature on the admissions form, the physician's clothing, and the custom and practice of the admissions staff, the court concluded:  "The hospital has presented competent undisputed evidence that it made affirmative representations as a matter of course to each patient as to the independent contractor status of physicians."  The court further explained:  "Here, the only evidence before the Court on the issue of whether the patient should have known the physician was not the hospital's agent is that the hospital advised the patient in writing of this fact.  Plaintiffs seek to infer that there is a triable issue of fact due to decedent's mental and/or physical condition at the time of admission, but this does not rebut the undisputed fact that the hospital's actions were such that any reasonable third person would be placed on notice that physicians were not agents of the hospital.  Whether there was any reliance is not at issue as the first element cannot be met."

Decedent's children, Dean Whitlow and Candace Whitlow-Powell, appeal.  They argue the record discloses the existence of disputed issues of material fact that must be resolved in determining whether the Conditions of Admission form signed by their

---

[1]  At oral argument, counsel for defendant hospital claimed the neurosurgeon's opinion could not be considered as it was beyond his competence.  However, the neurosurgeon's declaration was received and considered without objection.

4

mother in the emergency room is enforceable so as to preclude their claim against the hospital.

## DISCUSSION

## I

### *Standard of Review*

In our review of a summary judgment, the hunt is solely for triable issues of material fact.  (Code Civ. Proc., § 437c.)  The moving party bears the initial burden of producing evidence to demonstrate that one or more elements of the cause of action cannot be established or that there is a complete defense to the action.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853-854 (*Aguilar*).)  Summary judgment cannot be granted unless the moving party has met its initial burden of proof.  (*Thatcher v. Lucky Stores, Inc.* (2000) 79 Cal.App.4th 1081, 1086.)  But once the moving party makes this showing, the burden shifts to the opposing party to show the existence of a triable issue of material fact.  (*Aguilar*, at p. 850.)

An appellate court independently reviews an order granting summary judgment.  (*Aguilar*, *supra*, 25 Cal.4th at p. 860.)  In conducting our de novo review, we must view the evidence in the light most favorable to the losing litigant, liberally construing decedent's children's evidence while strictly construing the hospital's and resolving any evidentiary doubts or ambiguities in the children's favor.  (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1009.)

## II

### *Ostensible Agency in the Hospital Setting*

"A hospital is liable for a physician's malpractice when the physician is actually employed by or is the ostensible agent of the hospital."  (*Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 103.)  Because the issue of agency is a quintessential question of fact (*Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 168; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 502), it may be somewhat

surprising that a case alleging ostensible or apparent agency meets its early demise by summary judgment. But the hospital here, attempting to shed its vicarious liability for the negligence of the physicians who provide services in its emergency room, compels patients to sign a form acknowledging the physicians are independent contractors and posts signs delivering the same information.[2] The question thus presented is whether the hospital's form and signage entitles the hospital to judgment as a matter of law. Both sides rely on the same pivotal case to support opposite outcomes—*Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448 (*Mejia*).

It is important at the outset to acknowledge what *Mejia* is not. It is not a case exonerating a hospital. To the contrary, the Court of Appeal reversed a nonsuit that had been granted to the hospital. Indeed, the court went to great lengths to describe the evolution of the law imposing greater and greater liability on hospitals as their roles in their communities changed and patients came to expect that the hospitals would try to cure them, not that the nurses and physicians would act on their own responsibility. (*Mejia*, *supra*, 99 Cal.App.4th at p. 1453.) The doctrine of ostensible agency was utilized as a mechanism to impose liability on hospitals for the negligence of independent contractor physicians. (*Ibid.*)

The nuances of ostensible agency as a means of holding a hospital liable despite the independent contractor status of its physicians was explored in some depth in *Mejia*. The starting point in *Mejia* was, as it must be, the relevant California statutes. Section 2300 of the Civil Code states: "An agency is ostensible when the principal

_____

[2] It is important to distinguish a hospital's liability for its own negligence by failing "to insure the competence of its medical staff through careful selection and review" from its vicarious liability for the delivery of health care services in a given instance by its ostensible agents. (*Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332, 341.) This case involves vicarious liability only and the doctrine of corporate negligence is not at issue.

intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Civil Code section 2334 further provides: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof." At the heart of these statutes, the court distilled two essential elements: "(1) conduct by the hospital that would cause a reasonable person to believe there was an agency relationship and (2) reliance on that apparent agency relationship by the plaintiff." (*Mejia*, *supra*, 99 Cal.App.4th at p. 1457.) Citing a clear nationwide trend, the court wrote that ostensible agency can be inferred "from the mere fact that the plaintiff sought treatment at the hospital without being informed that the doctors were independent contractors." (*Ibid*.)

Reversing the nonsuit in favor of the hospital, the court concluded: "When this standard is applied to the case law governing ostensible agency in the hospital context, it appears difficult, if not impossible, for a hospital to ever obtain a nonsuit based on the lack of ostensible agency. Effectively, all a patient needs to show is that he or she sought treatment at the hospital, which is precisely what plaintiff alleged in this case. Unless the evidence conclusively indicates that the patient should have known that the treating physician was not the hospital's agent, such as when the patient is treated by his or her personal physician, the issue of ostensible agency must be left to the trier of fact." (*Mejia*, *supra*, 99 Cal.App.4th at p. 1458.)

Defendant hospital insists that it provided the very type of notice that "conclusively indicates that the patient should have known that the treating physician was not the hospital's agent." (*Mejia*, *supra*, 99 Cal.App.4th at p. 1458.) Even in California, where the courts assume the physician appears to be an agent, defendant maintains that it provided the requisite notice to the contrary. The trial court agreed, focusing on the conduct of the hospital, not the patient. It was persuaded that the Conditions of Admission form, the signs, the insignia on the doctor's clothing, and the hospital's

7

customs and practices provided notice to the patient and exonerated the hospital. Defendant hospital, however, fails to cite a single case in which a California court has found that a patient who enters an emergency room of a hospital in dire distress and excruciating pain and who is forced to sign admission forms that include the agency disclaimer is provided "notice" the hospital is not responsible for her care and the apparent agency of the emergency room physician is dispelled as a matter of law.

*Mejia* itself casts doubt on the hospital's position. Relying on compelling jurisprudence from our sister states, the court advised: "Many courts have even concluded that prior notice may not be sufficient to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information." (*Mejia*, *supra*, 99 Cal.App.4th at p. 1454.) The analysis provided by these courts is instructive.

In *Clark v. Southview Hosp. & Family Health Ctr.* (1994) 68 Ohio St.3d 435 [628 N.E.2d 46, 58 A.L.R.5th 929] (*Clark*), the court recognized the unique role of emergency rooms in our health care system. "With hospitals now being complex full-service institutions, the emergency room has become the community medical center, serving as the portal of entry to the myriad of services available at the hospital. As an industry, hospitals spend enormous amounts of money advertising in an effort to compete with each other for the health care dollar, thereby inducing the public to rely on them in their time of medical need. The public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein. Indeed, often the very nature of a medical emergency precludes choice. Public policy dictates that the public has every right to assume and expect that the hospital is the medical provider it purports to be." (*Id*. at p. 53.)

It is true that factually the hospital in *Clark*, unlike defendant hospital here, did not provide any notice to the decedent that the emergency room physician was an

8

independent contractor. Nevertheless, the court's rationale is sound. The court explained, "As to notice to the plaintiff that care is being provided by independent medical practitioners, we stress that such notice, to be effective, must come at a meaningful time." (*Clark*, *supra*, 628 N.E.2d at p. 54.) To be more specific, the court admonished that posting signs in an emergency room would rarely provide a patient with the ability to choose at a meaningful time. We agree with the further analysis the court adopted from a pertinent law review article: " 'The plaintiff, who by definition is injured and under stress, is relying upon the hospital to provide the services that the hospital has held out that it can provide. The plaintiff's reliance upon the hospital's competence has been demonstrated by her walking (or being wheeled) into the emergency room. Simply informing her that some doctors and staff have a different technical relationship with the hospital than the one she expected does not lessen the reasonableness of her reliance upon the hospital. Even if the patient understood the difference between an employee and an independent-contractor relationship, informing her of the nature of the relationship after she arrives is too late. The purpose of any notice requirement is to impart knowledge sufficient to enable the plaintiff to exercise an informed choice. The signs . . . are too little, too late.' [Evolution of Hospital Liability: Wisconsin Adopts Apparent Agency (1990), Wis.L.Rev. 1129,] 1147." (628 N.E.2d at p. 54, fn. 1.)

The same principle was echoed in *Sword v. NKC Hospitals, Inc.* (Ind. 1999) 714 N.E.2d 142, a case like *Clark* in which the hospital provided no notice at all that the emergency room physicians were independent contractors. Again the court observed, "Under some circumstances, such as in the case of a medical emergency, however, written notice may not suffice if the patient had an inadequate opportunity to make an informed choice." (714 N.E.2d at p. 152.)

Tellingly, the court in *Simmons v. Tuomey Regional Medical Center* (2000) 341 S.C. 32 [533 S.E.2d 312] (*Simmons*) forecast an emerging trend concerning a hospital's ability to give meaningful notice in emergency circumstances. "In sum, our

9

decision is amply supported by law in other jurisdictions. Courts throughout the nation have struggled with this issue, and nearly all have held hospitals liable under one or more theories. The Ohio cases illustrate what we perceive to be the likely trend among the many courts that have adopted an apparent agency theory in these cases. Under that trend, hospitals will not be allowed to escape liability by giving last-minute notice of independent-contractor practitioners through admission forms or emergency room signs." (*Id.* at p. 320.) Iowa followed that trend. A hospital's "liability arises from an ostensible agency, in that an emergency-room patient looks to the hospital for care, and not to the individual physician -- the patient goes to the emergency room for services, and accepts those services from whichever physician is assigned his or her case." (*Wolbers v. Finley Hosp.* (2003) 673 N.W.2d 728, 734 (*Wolbers*).) Furthermore, "expecting a patient in an emergency situation to debate or comprehend the meaning and extent of any representations by the hospital - which likely would be based on an opinion gradually formed over the years and not on any single representation - imposes an unfair and improper burden on the patient." (*Simmons*, *supra*, 533 S.E.2d at p. 321.)

A federal district court in California reversed a summary judgment in a case involving an incarcerated woman who was "shackled, in pain, and 'forced' to sign" a conditions of admission form, which stated that the physicians were not the hospital's agents but, rather, independent contractors. (*Van Horn v. Hornbeak* (E.D.Cal. Feb. 18, 2010, CV F 08-1622 LJO DLB) 2010 U.S.Dist. Lexis 14321 at *31.) The court emphasized that "[t]he question of ostensible agency is generally a question for the trier of fact unless the evidence conclusively establishes that the patient knew or should have known that the treating physician was not an agent of the hospital. [Citation.] Generally, under California law, ostensible authority is for a trier of fact to resolve and the issue should not be decided by an order granting summary judgment." (*Id.* at pp. *30-31.) The court held that the form did not conclusively establish that the inmate should have known there was no agency. Thus, in light of her affirmations regarding the manner in which

10

she was purportedly given notice, the court concluded there remained triable issues of material fact.  (*Id*. at pp. *31-32.)

The provision of medical services in an emergency implicates the public interest. (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 101 (*Tunkl*).)  In *Tunkl*, the court found an agreement to relieve the hospital of liability for the negligence of its employees invalid on the ground it violated public policy.  As explained by the court in *Tunkl*:  "In insisting that the patient accept the provision of waiver in the contract, the hospital certainly exercises a decisive advantage in bargaining.  The would-be patient is in no position to reject the proferred agreement, to bargain with the hospital, or in lieu of agreement to find another hospital.  The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract.  As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract.  Finally, when the patient signed the contract, he completely placed himself in the control of the hospital; he subjected himself to the risk of its carelessness."  (*Id*. at p. 102.)

While the "notice" provided in the Conditions of Admission form did not constitute a release agreement as in *Tunkl*, the same public policy concerns apply here where the hospital attempts to absolve itself of liability for the actions of the physicians and others manning the emergency room.  These concerns are most acute in an emergency room setting, where a patient often arrives in pain and distress and cannot reasonably be expected to discern from a boilerplate admissions form that the emergency physician he or she is provided by the hospital is not the hospital's agent.  For this reason, "[m]any courts have even concluded that prior notice may not be sufficient to avoid liability in an emergency room context, where an injured patient in need of immediate medical care cannot be expected to understand or act upon that information.  [Citations.]" (*Mejia*, *supra*, 99 Cal.App.4th at p. 1454.)

11

Thus, we reject the trial court's finding that defendant hospital successfully absolved itself of liability as a matter of law when a woman, writhing in pain and vomiting as a result of the worst headache she had had in her life, signed a boilerplate admissions form disclaiming the agency of the emergency room physician who treated her. Viewing the document in the light most favorable to the nonmoving party, we conclude the mere existence of a boilerplate admissions form is not sufficient to "conclusively indicate[] that [decedent] should have known that the treating physician was not the hospital's agent . . . ." (*Mejia*, *supra*, 99 Cal.App.4th at p. 1458.) Nor did the addition of the posted signs and the insignia on the doctor's clothing, in addition to the Conditions of Admission form, compel summary judgment. A jury will weigh the significance of these indicia of notice, but defendant's evidence constitutes only half of the story.

The jurors will also have the opportunity to consider decedent's son's testimony about his mother's condition at the time she signed the form and to weigh the neurosurgeon's expert opinion that, since decedent was suffering from a brain hemorrhage at the time she signed the form, she would be incapable of understanding its content. It is a question of fact whether the acknowledgment decedent signed in such a stressful situation was signed under duress. The jurors will determine whether the size, location, and content of the signs posted in the emergency room would give a reasonable person notice of the hospital's disclaimer and whether the insignia on the doctor's clothing identifying him as an employee of "California Emergency Physicians" would convey a lack of agency. The jurors will also weigh the son's testimony that the patient registration processor did not read or explain the form to his distressed mother against the processor's testimony that it was her custom and practice to do so. These are all questions of fact the jury must ultimately resolve to determine whether the patient had notice of the doctor's independent contractor status. But the adequacy of the notice is only one of the many fact questions that arise under ostensible agency. The jury must

12

also determine whether the patient entrusted herself to the hospital, whether the hospital selected the doctor, and whether the patient reasonably believed the doctor was an agent of the hospital.  (See *Renown Health, Inc. v. Vanderford* (Nev. 2010) 235 P.3d 614, 618 (*Renown Health*).)

Simply put, we reject the notion that a signature on an admissions form conclusively constitutes notice to a patient seeking care in an emergency room that the treating physician, whom she did not choose and did not know, is not an agent of the hospital.  The trial court erred in granting summary judgment, thereby absolving the hospital of liability as a matter of law.

## III

### *Nondelegable Duty?*

We asked the parties to brief an issue they had not addressed in their opening briefs, as follows:  "Does the nondelegable duty doctrine apply to care provided by a hospital's emergency room physicians as articulated by courts in other states?  (See, e.g., *Simmons v. Tuomey Regional Medical Center* (2000) 341 S.C. 32 [533 S.E.2d 312].)"  Defendant hospital provides a comprehensive analysis of the muddled state of the law across the country, including a number of examples where nondelegable duty is transformed into ostensible agency or the two distinct theories are hopelessly confused.

For example, in *Simmons*, the case we cited in our request, the court, on one hand, imposed a nondelegable duty on hospitals (*Simmons*, *supra*, 533 S.E.2d at pp. 320-321) but, on the other hand, refused "to impose an *absolute* nondelegable duty on hospitals" (*id*. at p. 318).  Public policy considerations such as "the fundamental shift in the role that a hospital plays in our health care system, the commercialization of American medicine, and the public perception of the unity of a hospital and its emergency room" (*id*. at p. 322) convinced the court that "a hospital owes a nondelegable duty to render competent service to its emergency room patients" (*ibid*.).  But immediately thereafter the court found it unnecessary to impose an "*absolute*" nondelegable duty and adopted a

13

Restatement approach "sometimes described as ostensible agency." (533 S.E.2d at p. 322.) We agree with defendant hospital that a nondelegable duty which is not absolute simply is not a nondelegable duty at all. Or, as the Nevada Supreme Court put it, "Once a 'nondelegable' duty becomes nonabsolute . . . the duty is no longer truly nondelegable." (*Renown Health*, *supra*, 235 P.3d at p. 617.)

Similarly, the Supreme Court in Iowa conflated nondelegable duty with ostensible agency. The court wrote: "A hospital has an absolute duty to its emergency-room patients to provide competent medical care, a duty which cannot be delegated. Thus, a hospital may be vicariously liable for the negligence of its emergency-room caregivers, even if they are designated as independent contractors. This liability arises from an ostensible agency, in that an emergency-room patient looks to the hospital for care, and not to the individual physician -- the patient goes to the emergency room for services, and accepts those services from whichever physician is assigned his or her case." (*Wolbers*, *supra*, 673 N.W.2d at p. 734.)

With this analytic thicket as a backdrop, defendant hospital also catalogues a number of justifications for steering away from the nondelegable duty doctrine. First and foremost, defendant hospital reminds us that hospitals, with some exceptions, cannot legally employ physicians.[3] (*Conrad v. Medical Bd. of California* (1996) 48 Cal.App.4th 1038, 1040.) Business and Professions Code section 2400 embodies a ban on the corporate practice of medicine. (*Conrad*, at p. 1041.) Section 2400 "was adopted to

_____

[3] "Professional medical corporations, in which shareholders are licensed professionals, are permitted. (Bus. & Prof. Code, § 2402; Corp. Code, § 13406, subd. (a).) Certain corporate hospitals and clinics are also permitted. (Bus. & Prof. Code, §§ 2400, 2401.) A major exception has been made for corporate health care service plans, which 'shall not be deemed to be engaged in the practice of a profession' and are free to employ physicians. (Health & Saf. Code, § 1395, subd. (b).)" (*California Physicians' Service v. Aoki Diabetes Research Institute* (2008) 163 Cal.App.4th 1506, 1514.) The statutory ban applies to nonprofit corporations. (*Id*. at p. 1515.)

14

protect the professional independence of physicians and to avoid the divided loyalty inherent in the relationship of a physician employee to a lay employer." (*California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 550.) Because a hospital cannot hire physicians and cannot practice medicine, defendant argues, it does not have a duty to be delegated. To the contrary, it would be unlawful for a hospital to dictate or control the exercise of a physician's clinical judgment.

*Hansell v. Santos Robinson Mortuary* (1998) 64 Cal.App.4th 608 (*Hansell*) offers a helpful analogy. In *Hansell*, the defendant mortuaries agreed to arrange for the cremation of the decedents by a licensed crematorium but did not perform the cremations themselves. The crematorium engaged in a number of wrongful practices, including conducting multiple cremations in the same cremation chamber at the same time and commingling the cremated remains. (*Id.* at p. 611.) The question presented was whether the mortuaries could be held vicariously liable for the crematorium's negligent mishandling of the remains. (*Id.* at p. 610.)

The mortuaries could not legally cremate the bodies, just as hospitals cannot practice medicine and cannot hire physicians. Indeed, the trial court compared the duty of the mortuaries to the duty of a hospital. " 'A mortuary may have a duty to [e]nsure the competency and professionalism of the firms to which it sends bodies for cremation similar to the duty of a hospital to screen its staff physicians, but here there is no evidence from which a reasonabl[e] trier of fact could conclude that [defendant mortuaries] breached that duty.' " (*Hansell*, *supra*, 64 Cal.App.4th at p. 612.) Thus, when a mortuary, like a hospital, hires an independent contractor, it does not remain vicariously liable for the negligence of the contractor. "[W]here defendant mortuaries lacked both the physical custody of the decedents' remains and the statutory authority to oversee the cremations, the general rule of nonliability obtains." (*Id.* at p. 614.) Defendant hospital would have us apply the same logic here since it, too, is statutorily prohibited from

15

exercising the very duty plaintiffs would have us impose. As we conclude below, however, we need not resolve this issue in this case.

Secondly, defendant hospital urges us to defer to the Legislature. In a heavily regulated field such as the practice of medicine, defendant maintains it is the Legislature that must weigh the relative pros and cons of the public policy to be employed. The Supreme Court in Nevada rejected the imposition of a nondelegable duty on hospitals for this very reason. The court explained: "[W]e decline to impose an absolute nondelegable duty on hospitals based upon public policy. This court may refuse to decide an issue if it involves policy questions better left to the Legislature. [Citations.] The Legislature has heavily regulated hospitals and would have codified a nondelegable duty to emergency room patients if the Legislature had intended such a duty to be imposed on hospitals." (*Renown Health*, *supra*, 235 P.3d at p. 616.)

Actually, *Renown Health* provides an apt resolution to the case before us. Although the court was unwilling to judicially create a nondelegable duty, which in its estimation was better left to the Legislature, it extended the ostensible agency doctrine and held the hospital "may be held liable for the acts of independent contractor emergency room doctors if the hospital selects the doctor and it is reasonable for the patient to assume that the doctor is an agent of the hospital." (*Renown Health*, *supra*, 235 P.3d at p. 618.) Of course, those issues are inherently factual.

We need not therefore resolve the nondelegable duty conundrum. Defendant hospital has exposed many analytic and policy complications we would have to untangle before taking the unprecedented step in California to impose a nondelegable duty on hospitals to provide competent medical services to individual patients in an emergency room setting. Because, as we have explained at length above, plaintiffs have demonstrated triable issues of fact regarding an ostensible agency theory of vicarious liability, the judgment must be reversed. Further consideration of the nondelegable duty question is unnecessary.

16

**DISPOSITION**

The judgment is reversed.

                                                _____RAYE_____, P. J.

We concur:

_____HULL_____, J.

_____DUARTE_____, J.