Filed 6/1/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARLINE WICKS et al., | B297171 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. MC027302) |
| v. | |
| ANTELOPE VALLEY HEALTHCARE DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Randolph A. Rogers, Judge.  Affirmed.

Law Offices of Michels & Lew, Philip Michels and Steven B. Stevens for Plaintiffs and Appellants.

La Follette, Johnson, DeHaas, Fesler & Ames, Arthur E. Zitsow, Julie Pollock Birdt and David J. Ozeran for Defendant and Respondent.

———————————————

## SUMMARY

The trial court granted summary judgment to a hospital in a lawsuit brought by the family of an emergency room patient who was released from the hospital and died eight hours later. We conclude no evidence showed that the nursing staff caused or contributed to the patient's death; no evidence showed the hospital was negligent in the selection and retention of the two emergency room doctors who treated the patient; and the evidence conclusively established the emergency room doctors were not the ostensible agents of the hospital.

Accordingly, we affirm the judgment.

## FACTS

### 1.     The Parties and the Complaint

Plaintiffs Marline and Bethanie Wicks are the spouse and daughter, respectively, of decedent Matthew Wicks. They sued two emergency room (ER) doctors (Christopher Belfour and Lawrence Michael Stock); Antelope Valley Emergency Medicine Associates, Inc.; and Antelope Valley Healthcare District, doing business as Antelope Valley Hospital (the hospital), for medical negligence in connection with Mr. Wicks's death on October 26, 2016.

As relevant here, the complaint alleged the defendant hospital selected and assigned physicians to care for and treat Mr. Wicks, and those individuals were the ostensible agents of the hospital. The complaint alleged the hospital was negligent in the "selection, training, retention, supervision and hiring" of the two ER doctors, and its nursing personnel were negligent in the care and treatment of decedent. No details were alleged in the complaint.

2

**2. Defendant's Motion for Summary Judgment**

The hospital moved for summary judgment, contending (1) its employees, nurses and nonphysician personnel complied with the standard of care in their care and treatment of Mr. Wicks; (2) no act or omission of the hospital negligently caused or contributed to his death; (3) the hospital was not negligent in its appointment of Dr. Stock or Dr. Belfour to the medical staff; (4) neither doctor was an employee or agent of the hospital; and (5) the hospital did not control, direct or supervise either doctor in his care or treatment of decedent. Defendant relied on the following evidence.

**a. The Holland declaration**

A declaration from Dr. J. Paul Holland, who has actively practiced as an emergency physician since 1979, provided the sequence of events at the hospital on October 26, 2016. His recitation of these events was based on his review of decedent's medical records for that day. Those records were attached as an exhibit to a declaration from defendant's counsel (the Birdt declaration), and authenticated in a declaration from the hospital's custodian of records, Laurie Lee Dorsey. The Holland declaration correctly recites what is shown in the medical records, as follows.

Mr. Wicks came to the emergency department at the hospital at 4:03 a.m., complaining of "[s]tomach pain[,] tight chest." His vital signs (blood pressure, pulse, oxygen saturation, etc.) were recorded at 4:17 a.m., and included a pain level of 7 out of 10. At 4:19 a.m. (the noted "triage time"), nurse Krystal Crawford noted Mr. Wicks's height and weight (including a BMI (body mass index) of 33.9), and that he complained of neck pain, cough, sore throat and "chest congestion x tonight per patient

3

'like a dull ache in my throat, like I'm getting strangled below my neck.'" She noted the patient was alert, denying any chest pain or shortness of breath, speaking normally, and ambulating without difficulty. After the triage, he was placed in a bed at 4:22 a.m.

Mr. Wicks was then evaluated by nurse Amberlyn Aroneo Wildoner. Her detailed notes, recorded at 4:59 a.m., state, among other details, that Mr. Wicks was alert, oriented and cooperative, appeared to be in distress due to pain, and stated he had woken up with a pain in his upper chest/throat. He described the pain as something "'stuck'" in his throat. He denied any shortness of breath or inability to swallow, and said "he feels like he needs to clear his throat but when he does it doesn't clear"; he said he also woke up with epigastric pain. Nurse Wildoner noted no respiratory distress, and "[c]hest pain present, upper, [s]ore throat present." Her notes at 5:03 a.m. show she placed him on a cardiac monitor, and her notes at 5:46 a.m. show she established an IV site, drew lab specimens and sent them to the lab.

Dr. Belfour evaluated Mr. Wicks at 5:10 a.m., ordered an electrocardiogram (ECG) and reviewed the ECG results at 5:34 a.m. Dr. Belfour also ordered a chest X-ray, and the records show radiologist Dr. Kellie Greenblatt reviewed it and noted, at 6:10 a.m., "[n]o radiographic evidence of acute cardiopulmonary disease"; "[n]o significant interval change"; and "[m]ild cardiomegaly" (enlarged heart).

Nurse Shelly Macias took over the care of Mr. Wicks from nurse Wildoner at 6:19 a.m. Her notes show he was "[s]tanding at bedside for comfort" at 6:29 a.m., she recorded his vital signs at 6:53 a.m., and at 7:05 a.m. a person from the lab was at bedside for another blood draw.

4

Dr. Stock took over Mr. Wicks's care after Dr. Belfour's shift ended at around 6:00 a.m.  According to Dr. Holland and the medical records, over the next several hours, in addition to the chest X-ray, various tests were performed, including another ECG, two troponin tests and other blood work.

Dr. Stock met and examined Mr. Wicks at 8:42 a.m., but testified he had no independent memory of the interaction.  His custom and practice was "obtaining history, understanding the context of how [the patient] got there, doing an exam, and reviewing risk factors . . . for the conditions, and then reviewing any of the lab data or any [test] results" done since the patient's arrival.  Although he had no independent memory of treating Mr. Wicks, Dr. Stock testified it was his custom and practice then and now to look at the electronic records system to see if Mr. Wicks had been treated at the hospital previously.  His custom and practice was to look through such documents for "a discharge summary, an old EKG, something to that effect that might be very useful."  (The term ECG is synonymous with EKG.)  When asked if part of his custom and practice would be "to look at the patient's past medical history," he responded, "Yes, I would talk to the patient, I'd read the chart and—and generally would look in the electronic medical record."

At around 11:00 a.m., Dr. Stock decided to discharge Mr. Wicks.  He had seen Mr. Wicks a second time and noted he had "improved"; by this time a second ECG and a second troponin test had been performed. (Vital signs recorded by the nurses at 6:53 a.m., 7:53 a.m. and 9:53 a.m. (blood pressure, pulse, oxygen saturation, etc.) were normal and stable, with pain reduced to 4 out of 10 at 6:53 a.m. and the same thereafter.)  The time on Dr. Stock's discharge order is 11:06 a.m.  Mr. Wicks was given

5

discharge instructions; these included a diagnosis of "chest pain of unclear etiology," and a referral to a cardiologist, as well as a follow-up with his primary care physician in one day. (Decedent's wife testified that one of the doctors (she said Dr. Belfour) told them he wanted Mr. Wicks to see a cardiologist the next day, and that he thought the cardiologist listed in the instructions "will see you tomorrow.") Mr. Wicks left the emergency department at 11:16 a.m., and died less than eight hours later. The cause of death was "acute dissection of aorta."

Dr. Holland opined that the care and treatment provided by the hospital's nursing and ancillary personnel "were within the standard of care at all times to a reasonable medical probability," and that no actions or inactions by nursing or ancillary personnel caused or contributed to Mr. Wicks's death. Among other things, Dr. Holland stated that "[i]t is not required by the standard of care for the nurses to go back and review prior records of a patient in the circumstance where the patient is alert and oriented."

### b. The Lutgen declaration

Defendant presented a declaration from Regina Lutgen, the hospital's manager of medical staff services. Ms. Lutgen was in charge of "the oversight of the practices of Medical Staff Services" at the hospital. She has been a "Certified Professional in Medical Staff Practices" since 2015.

Ms. Lutgen explained that hospitals in California are prohibited from employing physicians and surgeons to practice medicine under the Corporate Practice of Medicine Doctrine. Defendant therefore does not employ any physicians or surgeons and only employs nurses and nonphysician staff to implement the orders of the independent contractor physicians. She had

6

personal knowledge that the ER doctors who treated Mr. Wicks were independent contractors with staff privileges at defendant hospital and were not employed by defendant.

She stated that at all relevant times, the hospital "had appropriate procedures for appointment of medical staff members and periodic review of the competence of the physicians comprising the medical staff of the hospital, including appropriate procedures for the evaluation of medical staff applications and assignment of clinical privileges." Ms. Lutgen described the application and approval procedure; stated that each active member of the medical staff is reviewed for reappointment every two years; and stated that both Dr. Stock and Dr. Belfour had active privileges, were deemed competent by the procedure she described, and had active medical licenses without restriction by the state of California. She stated the hospital "complied with the standard of care in California at all times with regard to its appointment of medical staff."

### c.     The Birdt declaration

In addition to presenting the medical records mentioned above and copies of deposition testimony of various witnesses, the Birdt declaration included a copy of the hospital's "Conditions of Services" form that Mr. Wicks signed at 5:08 a.m. on October 26, 2016. Mrs. Wicks testified at her deposition that was her husband's signature, and she also recognized his initials on the document, a copy of which is an exhibit to her deposition.

The third paragraph of that document, initialed by Mr. Wicks, described the "legal relationship between hospital and physicians." (This and all other paragraph headings in the admission document were in boldface capital letters.) It states that all physicians providing services, including the emergency

7

physician, "are not employees, representatives or agents of the hospital."

### 3. Plaintiff's Opposition

Plaintiff's opposition contended that (1) defendant's motion had no admissible evidence to support it, instead relying on "an expert's recitation of events, gleaned from a review of unauthenticated documents"; (2) defendant was responsible for the negligence of physicians assigned to its emergency department; and (3) defendant offered "no admissible evidence that it did anything to review the applications of the physicians to assure that they were reasonably competent."

In addition to objecting to all of defendant's evidence, plaintiff submitted two expert declarations, plus medical records from Mr. Wicks's earlier (November 2015) outpatient admission to the hospital for hernia surgery. Defense counsel stipulated to the authenticity and foundation of those records.

### a. The Ritter declaration

Dr. Michael Steven Ritter has specialized in emergency medicine since 1994, and has held various positions in the emergency department at Mission Hospital in Mission Viejo since 1998. He has worked with and trained emergency medicine nurses throughout his career, and has handled hundreds of cardiac emergencies. Dr. Ritter stated that the standard of care for emergency department nurses is a national standard, because Mr. Wicks was treated in a major medical center located in a major metropolitan area.

Dr. Ritter described several entries in the 2015 medical records of decedent's hernia repair. These records indicated a history of smoking, morbid obesity, heart murmur, high blood pressure and high cholesterol. Dr. Ritter also described nurse

8

Wildoner's note of decedent's past medical history, which states: "History provided by, patient, No past medical history."

Dr. Ritter opined that the care and treatment provided by the hospital's nurses fell below the standard of care expected of emergency department nurses under similar circumstances. The nurses failed to review Mr. Wicks's chart and document his cardiovascular risk factors, and the discharge nurse did not document that she reassessed Mr. Wicks's level of pain immediately before his discharge. The medical records show the last pain level assessment at 9:53 a.m. (the pain level was 4, at 6:53 a.m., 7:53 a.m. and 9:53 a.m.), with discharge at 11:16 a.m. (The discharge nurse testified that her custom and practice was to ask the patient about his level of pain at the time of discharge.)

Dr. Ritter opined that if the nurses had obtained Mr. Wicks's medical history, a reasonably prudent emergency physician would have summoned a cardiologist for an emergency consult, the cardiologist would have ordered a CT scan with IV contrast, the CT scan would have shown the cause of Mr. Wicks's chest pain was an aortic dissection, and the cardiologist and ER physician would have arranged for a cardiothoracic surgery consult; if no surgeon was at its facility, Mr. Wicks would have been transferred to another facility, and Mr. Wicks "would have received timely diagnosis and treatment."

### b.     The MacGregor declaration

Dr. John S. MacGregor has specialized in cardiology and interventional cardiology since 1991. He testified he had been asked to review the case from the point of view of what a cardiologist would have done if called for an emergency consult of Mr. Wicks, and the likely outcome of such a consult. On the questions of whether the nurses violated their standards of care,

9

and what an emergency medicine physician would have done if they had complied with the standard of care, he deferred to Dr. Ritter and assumed the truth of Dr. Ritter's opinions.

Dr. MacGregor opined that if a cardiologist had been timely called for an emergency consult of a patient in Mr. Wicks's condition and with his history, the cardiologist would have ordered a CT scan with IV contrast. "As we know that Mr. Wicks was in pain and that he died seven hours later, we can determine that, more likely than not, a CT scan with IV contrast of the chest would have shown that the cause of Mr. Wicks' chest pain was a thoracic aortic dissection." A cardiologist would have arranged for a surgery consult; surgery would be performed, and Mr. Wicks would have survived.

### 4. Defendant's Reply

Defendant's reply stated that defendant did not dispute the qualifications of Dr. Ritter or Dr. MacGregor, but objected that both declarations were inadmissible on causation. Defendant objected to the causation opinions in both declarations on grounds of speculation, conjecture, lack of foundation, and failure to state causation to a reasonable medical probability.

### 5. The Trial Court's Decision

The court granted defendant's motion for summary judgment. The trial court overruled plaintiffs' objections to defendant's expert opinions and sustained defendant's objections to the causation opinions expressed by Dr. Ritter and Dr. MacGregor. Dr. Ritter's opinion that the nurses deprived Mr. Wicks of timely care was predicated "upon a long series of alleged dependent probabilities, which is legally a mere possibility," and thus "too speculative to be admitted as a matter of law." Dr. MacGregor's declaration suffered from the same

10

deficiency.  The trial court concluded Mr. Wicks received "actual notice that the emergency department physicians were independent contractors," and "no reasonable jury could find that Mr. Wicks did not understand the information provided."  And, the court found plaintiffs "have not cogently disputed [the hospital's] showing that it exercised reasonable care in retaining the identified emergency department physicians as independent contractors."

Judgment in favor of the hospital was entered on March 25, 2019, and plaintiffs filed a timely appeal.

## DISCUSSION

Plaintiffs contend there is no admissible evidence to support the summary judgment motion, so the burden of producing evidence never shifted to plaintiffs.  They contend that even if defendant's evidence is admissible, the opposing Ritter and MacGregor expert declarations demonstrate triable issues of material fact that negligence by the hospital's nurses was a substantial factor in causing Mr. Wicks's death.  And they contend the form Mr. Wicks signed and initialed telling him the ER doctors were independent contractors and not employees or agents of the hospital does not conclusively establish the doctors were not defendant's ostensible agents.

None of these contentions has merit.

## 1.     The Standard of Review

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the

11

moving party is entitled to a judgment as a matter of law." (*Id.,* subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) It is no longer called a "disfavored" remedy. (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*) On appeal, "we take the facts from the record that was before the trial court . . . . ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

We apply the abuse of discretion standard to the trial court's evidentiary rulings. (*Ducksworth v. Tri-Modal Distribution Services* (2020) 47 Cal.App.5th 532, 544.)

**2.   Defendant's Evidence Was Properly Admitted**

We dispose first of plaintiffs' assertion that none of defendant's evidence was admissible, so plaintiffs did not have to produce any evidence. Plaintiffs are mistaken.

**a.   The Holland declaration and the medical records**

With no basis either in fact or law, plaintiffs assert the Holland declaration is inadmissible because it is based on hearsay. Dr. Holland's opinion was based on his review of Mr. Wicks's medical records and the deposition testimony of witnesses in this case. Inexplicably, plaintiffs say the medical records were unauthenticated. The medical records were

12

properly authenticated as the hospital's business records, and as such, they are not hearsay. They are the type of records on which medical experts may and do rely in order to give expert testimony in a medical malpractice case. (*Garibay v. Hemmat* (2008) 161 Cal.App.4th 735, 741-742 (*Garibay*) [in professional malpractice cases, expert opinion testimony is required to prove defendant's performance met the prevailing standard of care, except in cases where the negligence is obvious to laymen, but expert opinion has no evidentiary value unless authenticated medical records on which expert relied are offered in evidence].)

Here, defense counsel's declaration stated that the copies of Mr. Wicks's medical records provided to Dr. Holland for review "were true and exact copies of the records provided directly to my office by the hospital's Health Information Management supervisor," and that a true and correct copy of Mr. Wicks's hospital records from October 26, 2016, along with the declaration of the hospital's custodian of records, is attached as Exhibit C to the volume of documentary evidence filed with defendant's summary judgment motion. The custodian's declaration in turn establishes these as the hospital's business records as described in Evidence Code section 1271. No more was required, but in addition, these very same medical records were identified at the depositions of the ER nurses and doctors who created them—for example, nurses Macias, Wildoner and Crawford.

Plaintiffs assert other baseless reasons why they think the medical records in support of the summary judgment motion were inadmissible, and each contention is utterly without merit. They say defendant's separate statement did not provide page citations to the medical records, or to the deposition testimony on

13

which Dr. Holland relied in forming his opinions, and this failure violated California Rules of Court, rule 3.1350(d)(3) (separate statement must state undisputed material facts, including "reference to the exhibit, title, page, and line numbers"). Defendant complied with that rule by citing specific paragraphs of Dr. Holland's declaration as the evidence supporting each undisputed material fact recited in the separate statement. Citation to the particular page of each medical record and witness testimony which provided the factual basis for each of Dr. Holland's opinions is not required by rule 3.1350(d)(3).

Plaintiffs say, as in *Garibay*, Dr. Holland had no personal knowledge of the underlying facts, so his narration of those facts " 'had no evidentiary foundation.' " The expert's declaration in *Garibay* had no evidentiary foundation because in that case the medical records were *not* before the court. "Without those hospital records, and without testimony providing for authentication of such records," the expert's declaration had no evidentiary basis. (*Garibay, supra,* 161 Cal.App.4th at p. 742.) In this case, defendant provided the medical records in support of the motion and authenticated them six ways from Sunday.

Plaintiffs also assert that because the hospital is a party, the declaration of its custodian of records is insufficient authentication. No case authority is cited for this preposterous assertion. Plaintiffs incorrectly infer that Evidence Code section 1560 supports their assertion, but it does not. Section 1560 governs the sufficiency of compliance with a subpoena duces tecum that is served upon a custodian of records of a business in an action where the business is not a party. Nothing in section 1560 suggests that a hospital's custodian of records cannot authenticate its own records. The business records

14

exception to the hearsay rule, Evidence Code section 1271, governs the admissibility of hospital records, and Ms. Birdt's declaration supplied the facts to authenticate defendant's business records.

### b. The Lutgen declaration and plaintiff's negligent hiring claim

Plaintiffs similarly contend the Lutgen declaration was inadmissible hearsay, and therefore the burden of producing evidence on their negligent hiring claim did not shift to them. Again, they are mistaken.

We have described the Lutgen declaration (at pp. 6-7, *ante*). In paragraphs 2, 4, 5, 6 and 7, Ms. Lutgen described the hospital's procedures for the appointment and evaluation of independent contractor physicians and surgeons who comprise the medical staff of the hospital, opined those procedures were appropriate and complied with the standard of care concerning the appointment of medical staff, and stated those procedures were used in the appointment and periodic evaluations of every physician applying for appointment to the medical staff. As the hospital's manager of medical staff services, in charge of the oversight of the practices of medical staff services, she had personal knowledge of the hospital's procedures for awarding staff privileges to its physicians and personal knowledge that the hospital acted consistently with its procedures in appointing each of its staff doctors.

Plaintiffs say Ms. Lutgen's testimony "is nothing more than inadmissible hearsay testimony about the contents of a file" that is inadmissible under *People v. Sanchez* (2016) 63 Cal.4th 665, 684 (*Sanchez*) ("If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements

are necessarily considered by the jury for their truth, thus rendering them hearsay.").  In paragraph 9 of her declaration, Ms. Lutgen testified that she looked at the medical staff services files of Drs. Stock and Belfour, and in paragraph 12, she testified that she looked at the roster of physicians with medical staff privileges at defendant hospital.  (We asked counsel, in advance of oral argument, to address during argument the question whether the statements in paragraphs 9 and 12 were hearsay, and whether the foundational requirements for the business records exception to the hearsay rule were shown.  Counsel did so.)

In addition to the statements just described in paragraphs 9 and 12, Ms. Lutgen testified to her understanding that the hospital's files on the ER doctors were protected from discovery, citing Evidence Code section 1157.  She stated she would comply with a court order to produce the files for in camera review.  Such files are confidential and not subject to discovery.  (Evid. Code, § 1157, subd. (a) ["Neither the proceedings nor the records of organized committees of medical . . . staffs in hospitals, . . . having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, . . . shall be subject to discovery."]; *Mt. Diablo Hosp. Medical Center v. Superior Court* (1984) 158 Cal.App.3d 344, 347 [" 'Section 1157 represents a legislative choice between competing public concerns.  It embraces the goal of medical staff candor at the cost of impairing plaintiffs' access to evidence.' "].)  Defense counsel told us at oral argument plaintiffs never requested an in camera review of the ER doctors' files and therefore waived the *Sanchez* objection to paragraph 9 of Ms. Lutgen's declaration.

We do not need to decide if paragraph 9 is inadmissible under *Sanchez* or whether plaintiffs waived the *Sanchez* objection by failing to request an in camera review of the ER doctors' files. Ms. Lutgen's testimony in paragraphs 2, 4, 5, 6 and 7 was based on her personal knowledge and was sufficient to show the ER doctors were granted staff privileges in accordance with appropriate procedures for the appointment and evaluation of independent contractor physicians and surgeons who comprise the medical staff of the hospital. It was then up to plaintiffs to create a material disputed fact that the ER doctors lacked credentials or for any reason should not have been granted or permitted to retain staff privileges. They offered no evidence, and consequently summary judgment of their negligent hiring claim was proper.

3. **Plaintiffs' Evidence Did Not Create A Material Dispute That Any Nurse's Action Or Omission Caused Or Contributed To Mr. Wicks's Death.**

The defense expert, Dr. Holland, opined that no actions or inactions by nursing or ancillary personnel caused or contributed to Mr. Wicks's death. Plaintiffs contend Dr. Holland's opinion on causation was conclusory and therefore inadmissible, and in any event the trial court erred in disregarding the Ritter and MacGregor opinions on causation. We disagree on both points.

a. **Dr. Holland's opinion**

We see nothing conclusory in Dr. Holland's opinion. He accurately recounted, based on his review of the hospital records, everything that happened in detail from the time Mr. Wicks presented at the ER until his discharge. He opined the nurses regularly and appropriately attended to Mr. Wicks. Their evaluations were appropriate. Mr. Wicks's vital signs were noted

17

four times, and each time, they were in normal limits. The nurses correctly carried out all doctors' orders. All labs ordered were performed and the two ECG's and X-ray that were ordered were performed.

Dr. Holland pointed out that the two ER doctors testified it was their custom and practice to ask about the patient's past medical history and chronic conditions. When a patient is alert and oriented, there is no need for a nurse to obtain and note a patient's medical history, as the patient can give the doctors any further medical history the doctors may think they need.

Dr. Holland testified an aortic dissection is extremely difficult to diagnose and has a very high mortality rate even if it is diagnosed early. It is undisputed that nurses cannot diagnose an aortic dissection or interpret the results of an ECG or chest X-ray, and it is not the nurses' responsibility to order further tests. Nurses cannot order a patient admitted to the hospital or order a cardiology consult; only a doctor can do those things. There is no record that a doctor issued any order that the nurses failed to carry out. Nothing in Mr. Wicks's vital signs, lab results or the notes of the ER doctors' review of the ECG's, X-ray and troponin levels would have alerted a nurse to do anything these nurses did not do.

In short, Dr. Holland thoroughly explained the facts on which he based his opinion and the reasons why he concluded the nurses met the standard of care and did not contribute to Mr. Wicks's death. The trial court did not err in overruling plaintiffs' objections to his testimony.

### b. Dr. Ritter's opinion

That brings us to the declarations of plaintiffs' experts.

Since defendant did not dispute the qualifications of Dr. Ritter or Dr. MacGregor, we assume they were qualified to offer expert opinions in this case.  But we find neither expert declaration created a material disputed fact that the nurses' performance caused or contributed to Mr. Wicks's death to a reasonable medical probability.

Dr. Ritter testified the nurses were negligent in that they failed to review Mr. Wicks's chart and document his cardiovascular risk factors, and nurse Macias did not document that she reassessed Mr. Wicks's level of pain before his discharge.  Dr. Ritter testified that if the nurses had done these things, then (1) to a reasonable degree of medical probability, an ER doctor would have summoned a cardiologist, (2) the cardiologist more likely than not would have ordered a CT scan with IV contrast or other advanced diagnostic studies, (3) more likely than not, the CT scan with IV contrast would have shown the aortic dissection, (4) the ER doctor and the cardiologist would have arranged for a cardiovascular surgery consultation, and (5) if the hospital had no cardiothoracic surgeon, then, more likely than not, Mr. Wicks would have been transferred to another facility for the consultation.  Dr. Ritter opined, "I can determine to a reasonable degree of medical probability, if the nurses had obtained a proper and complete history and provided it to the emergency medicine physician, Mr. Wicks would have received timely diagnosis and treatment."

We agree with the trial court this is speculation and lacks reasoned explanation.  Dr. Ritter did not explain how the nurses' failure to take a history contributed to any of the decisions made by the ER doctors.  He did not explain why, if the nurses had taken a history and documented Mr. Wicks's pain level

19

immediately before discharge, that would have informed the ER doctors they needed to take any of the steps enumerated above. Dr. Ritter completely ignored the testimony of both ER doctors that they themselves customarily reviewed a patient's medical history. The nurses' failure to report Mr. Wicks's history to the ER doctors could not have caused or contributed to his death, because the doctors themselves obtained Mr. Wicks's history, and Dr. Stock reviewed the hospital's electronic records, so they did not need the nurses' notes.

Dr. Ritter opined the nurses should have noted Mr. Wicks's history of heart murmur, smoking cigarettes, hypertension, high cholesterol, and morbid obesity. The undisputed evidence shows that four times, the nurses took and recorded Mr. Wicks's vital signs, including blood pressure, pulse and oxygen saturation, and they noted his body mass index indicating obesity. An hour after he arrived at the hospital, nurse Wildoner placed Mr. Wicks on a cardiac monitor, and less than an hour later she established an IV site, drew lab specimens and sent them to the lab.

The ER doctors ordered numerous tests to determine if Mr. Wicks needed emergency cardiac care. The doctors ordered and evaluated the results of two ECG's, a chest X-ray, two troponin tests and other blood work. Dr. Ritter offers no explanation why nurses' notes summarizing past records of cardiac risk factors would have helped the ER doctors understand anything about Mr. Wicks's cardiac condition that they did not already know from his vital signs, ECG's, chest X-ray and troponin tests.

Dr. Ritter opined that if the doctors had ordered a cardiology consultation, a cardiologist would have ordered a CT scan with IV contrast. But Dr. Ritter did not dispute

20

Dr. Holland's testimony that only a doctor can order tests such as a CT scan, order a cardiology consultation, and decide whether to discharge or admit a patient to the hospital.  Dr. Ritter does not explain how a nurse's notes would have informed the ER doctors they needed to order a CT scan with IV contrast.  The ER doctors did not need a nurse's notes of Mr. Wicks's cardiac risk factors to decide whether Mr. Wicks needed a cardiology consultation; they indisputably knew he needed a cardiology consultation, because they told him to consult a cardiologist the next day.  What the ER doctors did not know is that Mr. Wicks would suffer an aortic dissection several hours later, but Dr. Ritter does not explain how nurses' notes or an inquiry about Mr. Wicks's level of pain immediately before his discharge would have alerted the ER doctors that they needed to rule out aortic dissection.

In sum, Dr. Ritter's opinions lack reasoned explanation for his conclusions, and his opinions rest not on facts but on a series of hypothetical conditions, i.e., if the ER doctors had ordered an emergency cardiology consult, then more tests would have been ordered, and the tests would have revealed the risk of aortic dissection, and surgery would have been performed, and Mr. Wicks would have survived.  An expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.  (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523.)

The holes in Dr. Ritter's declaration cannot be backfilled by the declaration of Dr. MacGregor, who hedged in giving his testimony by saying he had no opinion on whether the nurses met the standard of care, or on what an ER doctor would have

done if the nurses had met the standard of care. He simply assumed as true the facts and opinions expressed by Dr. Ritter. An expert may not predicate an opinion on the opinion of another expert. (*Christiansen v. Hollings* (1941) 44 Cal.App.2d 332, 347 ["It is, of course, the rule . . . that the opinion of an expert cannot be predicated on the opinion of another expert."].) Dr. MacGregor simply assumed causation from the fact of Mr. Wicks's death. An expert's opinion that something is true if certain assumed facts are true, without any foundation for concluding those assumed facts exist, has no evidentiary value. (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.)

In short, the trial court did not err in sustaining defendant's objections to the Ritter and MacGregor declarations on causation. Because plaintiffs did not create a triable issue on whether the nurses' conduct caused or contributed to Mr. Wicks's death, summary judgment for the hospital was proper.

## 4. The ER Doctors Were Not Ostensible Agents of the Hospital.

It is well established in California that a hospital may be liable for the negligence of physicians on the staff, unless the hospital has clearly notified the patient that the treating physicians are not hospital employees and there is no reason to believe the patient was unable to understand or act on the information. This rule is founded on the theory of ostensible agency.

In *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448 (*Mejia*), the court explained the required elements of ostensible agency: "(1) conduct by the hospital that would cause a reasonable person to believe there was an agency relationship and (2) reliance on that apparent agency relationship by the plaintiff." (*Id.* at p. 1457.) *Mejia* observed

22

that California law has "inferred ostensible agency from the mere fact that the plaintiff sought treatment at the hospital without being informed that the doctors were independent contractors." (*Ibid.*)  "Thus, unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or because the patient was treated by his or her personal physician—ostensible agency is readily inferred."  (*Id.* at pp. 1454-1455.)

In this case, after Mr. Wicks had been in defendant's emergency room for a little over an hour, he signed and initialed an admission form that stated, "All physicians and surgeons providing services to me, including the radiologist, pathologist, emergency physician, anesthesiologist, and others, are not employees, representatives or agents of the hospital. . . .  [T]hey have been granted the privilege of using the hospital for the care and treatment of their patients, but they are **not** employees, representatives or agents of the hospital.  They are independent practitioners."

Plaintiffs contend the evidence defendant presented—the signed and initialed admission form, plus evidence of Mr. Wicks's physical and mental state and surrounding circumstances at the time—did not establish, as a matter of law, that the doctors were not the hospital's ostensible agents.  Plaintiffs rely on *Mejia* and *Whitlow v. Rideout Memorial Hospital* (2015) 237 Cal.App.4th 631 (*Whitlow*).  They contend these cases stand for the proposition, in effect, that no matter what circumstances bring a patient to an emergency room, an admission form notifying the patient that the ER doctor is not an employee or agent of the hospital cannot establish lack of agency as a matter of law.  We do not so read *Mejia* and *Whitlow*.

23

The facts and circumstances in *Mejia* and *Whitlow* are entirely different than this case. In *Mejia*, the hospital did not give the patient any notice that its staff physicians were independent contractors, and the patient had no reason to know they were not agents of the hospital. (*Mejia, supra*, 99 Cal.App.4th at p. 1450.) In contrast with *Mejia*, Mr. Wicks signed a straightforward notice, with no obtuse legalese, telling him the staff physicians were independent contractors and not employees or agents.

In *Whitlow,* the patient was in no condition to understand the admission form she signed in the emergency room stating that all physicians furnishing services to her were independent contractors and not employees or agents of the hospital. Her son declared his mother was "crying in horrible pain" when the hospital's registration processor told her to sign and initial the form, she was nauseous and unable to read it, and the processor did not explain the contents of the form or read it to her. (*Whitlow, supra,* 237 Cal.App.4th at pp. 633-634.) A neurosurgeon who reviewed the decedent's medical records and her son's declaration opined she was suffering from a massive left temporal hemorrhage and was incapable of understanding what was contained in the form. (*Id.* at p. 634.)

The *Whitlow* court described the patient as "in dire distress and excruciating pain" and as being "forced to sign admissions forms that include the agency disclaimer." (*Whitlow, supra,* 237 Cal.App.4th at p. 637; see *id.* at p. 640 ["we reject the trial court's finding that defendant hospital successfully absolved itself of liability as a matter of law when a woman, writhing in pain and vomiting as a result of the worst headache she had had in

24

her life, signed a boilerplate admissions form disclaiming the agency of the emergency room physician who treated her"].)

In contrast with *Whitlow*, there is nothing to suggest Mr. Wicks was incapable of understanding the admission form. He drove himself to the hospital. He was not in dire distress or excruciating pain. The form Mr. Wicks signed has a special line for him to initial that he was aware the doctors were not employees. He initialed the line and signed the form about an hour after he arrived at the ER. Nine minutes before he signed it, hospital records described him as alert, oriented, cooperative and able to describe his symptoms. Dr. Belfour spoke with Mr. Wicks two minutes after he signed the form and noted Mr. Wicks reported moderate chest discomfort. And Mr. Wicks had signed and initialed the same forms before on two previous hospital admissions in 2015.

At the factually opposite end of the spectrum from *Mejia* and *Whitlow* is *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, where the court found no basis to hold a hospital liable for the negligence of a staff physician. The physician had been the patient's chosen personal doctor for four and a half years. (*Id.* at p. 1033.) The patient signed 25 conditions of admission forms and other consent forms notifying him that his physician was an independent contractor, not an agent or employee of the hospital. (*Id.* at pp. 1033-1034.) The patient did not seek emergency care from the hospital. Despite evidence that the physician was the hospital's director of its pain clinic, used the hospital's name and logo on his business cards, wore a hospital badge, and treated patients in a building displaying the hospital's name and logo, the court found these facts were "negated" by the actual notice the hospital gave the patient that his doctor was an independent

contractor, not the hospital's agent or employee. (*Markow*, at pp. 1041-1042.)

In contrast with *Markow*, here Mr. Wicks sought emergency care from hospital staff physicians he did not choose, and he had previously signed two, not more than 25, hospital forms notifying him the staff physicians were not employees or agents.

Neither *Mejia*, *Whitlow*, nor *Markow* is factually on point with this case. Yet all three opinions inform our decision in this case. They rest on the same principle of California law, that although a hospital may not control, direct or supervise physicians on its staff, a hospital may be liable for their negligence on an ostensible agency theory, unless (1) the hospital gave the patient actual notice that the treating physicians are not hospital employees, and (2) there is no reason to believe the patient was unable to understand or act on the information, or (3) the patient was treated by his or her personal physician and knew or should have known the true relationship between the hospital and physician.

The undisputed evidence in this case is that defendant gave Mr. Wicks meaningful written notice, acknowledged by Mr. Wicks at the time of admission, only a little over an hour after he arrived at the hospital, when he was alert, oriented and cooperative, that the staff physicians were not employees or agents. Hospitals providing emergency care to members of the public who do not have an appointment or any relationship with the staff physicians have no practical means to give such notice before a patient is admitted. Were we to accept plaintiffs' argument that defendant may be liable in this case for the negligence of its ER doctors, there would be no circumstance

26

under which actual notice to an ER patient of an ER doctor's status as an independent contractor would suffice to avoid a hospital's liability for the doctor's negligence.

## DISPOSITION

The judgment is affirmed.  Defendant shall recover its costs on appeal.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.